Robert TILLER, Appellant–Defendant,

v.

STATE of Indiana, Appellee–Plaintiff.

No. 45A03–0802–CR–78.

Court of Appeals of Indiana.

Nov. 13, 2008.

Rehearing Denied Jan. 6, 2009.

John F. Crawford, Crawford & Devane, Indianapolis, IN, Attorney for Appellant.

Steve Carter, Attorney General of Indiana, Nicole M. Schuster, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

FRIEDLANDER, Judge.

Following a jury trial, Robert Tiller was convicted of Attempted Murder,[1] a class A felony, Confinement[2] as a class B felony, and Escape[3] as a class B felony. The trial court subsequently sentenced Tiller to an aggregate sentence of sixty-six years imprisonment. On appeal, Tiller presents three issues for our review:

1. Did the trial court properly instruct the jury on accomplice liability for a charge of attempted murder?

2. Did the trial court properly allow the victim's deposition to be read into evidence when the victim failed to appear to testify during trial?

3. Is the evidence sufficient to sustain Tiller's conviction for attempted murder?

We reverse and remand.

The facts most favorable to the convictions follow. On December 24, 2005, fifteen-year-old T.T. was staying at Willow Glen Academy, a home for troubled teens. While talking on the phone, T.T. asked her direct care counselor, Zatia Sain, to take the phone, upon which Sain spoke with Tiller, T.T.'s brother. After several additional phone calls and a face-to-face meeting with Tiller, Sain agreed to help T.T. leave the secure facility given Tiller's threat to enter the building and kill everyone inside. The initial plan to have T.T. get out of the building was interrupted when other adults noticed that T.T. had thrown her possessions out the window. Notwithstanding the foiled plan, T.T.'s

1. Ind.Code Ann. § 35-42-1-1 (West, Premise through 2007 1st Regular Sess.) (murder); Ind.Code Ann. § 35-41-5-1 (West, Premise through 2007 1st Regular Sess.) (attempt).

2. I.C. § 35-42-3-3 (West, Premise through 2007 1st Regular Sess.).

3. Ind.Code Ann. § 35-44-3-5 (West, Premise through 2007 1st Regular Sess.).

boyfriend, Louis James, armed with a silver revolver, entered through the secured front door that had been left ajar for T.T.'s exit and yelled for T.T. Shortly after 7:00 p.m., Brandon Peterman, a counselor at Willow Glen, was confronted by James, who told Peterman not to move or "it would be over for [him]". *Transcript* 94–95. T.T. left the building with James.

About 10:00 p.m., Tiller, James, T.T., and another individual, Korey Looney, arrived at the home of Angela Arriaga, a friend of Tiller's. Arriaga and her four children were not present when the foursome arrived, but Arriaga's fiancé, Richard Cannon, was at the home watching television. Tiller asked Cannon if T.T. could stay at the house for a few days, and Cannon told him "no". *Id.* at 149. Tiller continued to ask Cannon if T.T. could stay, and then eventually asked Cannon if that was his final answer, and Cannon said "yes, that's my final answer". *Id.* at 150. Tiller then directed James and Looney to "tie this mother-fucker up". *Id.* The two men beat Cannon about the face as he resisted. Tiller was also involved in this altercation with Cannon. Finally, Tiller handed James a .38 caliber silver revolver, and James held the gun to Cannon's head. With Cannon subdued, James and Looney tied Cannon up with shoelaces from his own shoes, wrapped him in a blanket, and put him in the trunk of the car Tiller brought to the house. As they drove, Cannon managed to free his feet and remove the gag from his mouth. When the car stopped, James and Looney pulled Cannon from the trunk, James shot him one time in the face and left him on the ground. After the men left, Cannon managed to get to a nearby house, where help was summoned. Cannon did not see Tiller at the scene of the shooting.

Shortly after 11:00 p.m., Arriaga arrived home with her four children and found T.T. attempting to clean up. Arriaga soon left to make phone calls in an attempt to find Cannon. While out, she encountered Tiller in a car with James and Looney. Tiller told Arriaga to go home, and he arrived shortly thereafter. He asked Arriaga if T.T. could stay at her home, and Arriaga initially said no. After further urging from Tiller, Arriaga reluctantly agreed. Police eventually recovered a .38 caliber revolver at 1357 Johnson Street, a place where Tiller, Johnson, and Looney had stayed.

At trial, Tiller claimed that he did not participate in helping T.T. escape from Willow Glen. Tiller also testified that he was not involved in a fight with Cannon at Arriaga's residence. Tiller further testified that he was not aware that James and Looney had placed Cannon in the trunk of the car and that when he found out about it, he said, "I don't have nothing to do with this" and got out of the car. *Id.* at 617.

On December 30, 2005, the State charged Tiller with Count I, attempted murder as a class A felony; Count II, confinement as a class B felony; Count III, aggravated battery as a class B felony; and Count IV, battery as a class C felony. On January 6, 2006, under a separate cause, the State charged Tiller with escape as a class B felony (Count V). On October 4, 2006, the trial court joined the two causes pursuant to the State's motion. A five-day jury trial commenced on November 5, 2007. At the conclusion of the evidence, the jury found Tiller guilty as charged. On January 23, 2008, the trial court sentenced Tiller to an aggregate sentence of sixty-six years.[4]

4. The trial court merged Counts III and IV with Count I, and entered convictions on only Counts I, II, and V. The trial court sentenced Tiller to forty-eight years on Count I (attempt-

### 1.

■ Tiller argues that the trial court committed fundamental error in erroneously instructing the jury on the mens rea necessary to find him guilty of attempted murder under a theory of accomplice liability. Specifically, Tiller maintains that a conviction as an accomplice to attempted murder requires proof that he intended to kill the victim when he aided, induced, or caused another person to commit attempted murder and that the jury was not so instructed.

Because of the stringent penalties for attempted murder and the ambiguity often involved in its proof, our Supreme Court has singled out attempted murder for special treatment. *Hopkins v. State*, 759 N.E.2d 633 (Ind.2001). In this regard, our Supreme Court has stated that a conviction for attempted murder requires proof of specific intent to kill. *Id.* (citing *Spradlin v. State*, 569 N.E.2d 948 (Ind.1991)). Where the State seeks a conviction for attempted murder on an accomplice liability theory, our Supreme Court has held that the State is required to prove: (1) that the accomplice, acting with the specific intent to kill, took a substantial step toward the commission of murder, and (2) that the defendant, acting with the specific intent that the killing occur, knowingly or intentionally aided, induced, or caused the accomplice to commit the crime of attempted murder. *Id.* (citing *Bethel v. State*, 730 N.E.2d 1242 (Ind.2000)).

Here, Final Instruction No. 3 defined the crime of attempted murder:

Attempted Murder, as alleged in Count I of the charging Information, is defined by statute in Indiana in pertinent part as follows:

A person attempts to commit murder when, acting with the intent to kill, he intentionally engages in conduct that constitutes a substantial step toward commission of the crime. An attempt to commit murder, is a class A felony.

Murder is defined as the knowing or intentional killing of a human being.

To convict the defendant of the crime of Attempted Murder, the State must have proved each of the following elements beyond a reasonable doubt:

1) the Defendant:

2) acting with the specific intent to kill Richard Lonell Cannon

3) did intentionally attempt to kill Richard Cannon, by shooting at and wounding him, with a deadly weapon

4) which was conduct constituting a substantial step toward the commission of the intended crime of killing Richard Cannon

5) on or about December 24, 2005.

*Appellant's Appendix* at 135. The trial court further instructed the jury in Final Instruction No. 14 as to accomplice liability:

Where two or more persons engage in the commission of an unlawful act each person may be criminally responsible for the actions of each other person which were a probable and natural consequence of their common plan even though not intended as part of the original plan. It is not essential that participation of any one person to each element of the crime be established.

A person who knowingly or intentionally aids, induces or causes another person to commit an offense commits that offense, even if the other person:

ed murder), eighteen years on Count II (confinement), and eighteen years on Count V (escape). The court ordered the sentence on

Count I to run consecutive to the sentence on Count V, and the sentence on Count II to run concurrent with the sentence on Count V.

1) has not been prosecuted for the offense;

2) has not been convicted of the offense; or

3) has been acquitted of the offense.

To aid under the law is to knowingly aid, support, help or assist in the commission of a crime. Mere presence at the scene of the crime and knowledge that a crime is being committed are not sufficient to allow an inference of participation. It is being present at the time and place and knowingly doing some act to render aid to the actual perpetrator of the crime.

The presence of a person at the scene of the commission of a crime and companionship with another person engaged in the commission of the crime and a course of conduct before and after the offense are circumstances which may be considered in determining whether such person aided and abetted the commission of such crime.

*Id.* at 146.

 Tiller acknowledges that he did not object to these instructions nor tender a correct instruction, but nevertheless seeks to avoid procedural default by arguing that the instructions constituted fundamental error. Fundamental error is a substantial, blatant violation of due process. *Hopkins v. State*, 759 N.E.2d 633 (Ind.2001). The error must be so prejudicial to the rights of a defendant to make a fair trial impossible. *Id.*

In *Hopkins v. State*, our Supreme Court considered two instructions on accomplice liability that properly informed the jury of general accomplice liability, i.e., the defendant could be held responsible for the actions of another person if he "knowingly" aided, induced, or caused another person to commit a crime. 759 N.E.2d at 637. Our Supreme Court held that such instruction, however, did not adequately instruct the jury on the requisite intent to kill needed to be guilty of the crime of attempted murder as an accomplice.[5] The Court noted that given the Defendant's intent was at issue, the trial court's failure to instruct the jury regarding the specific intent requirement for an attempted murder conviction based on accomplice liability constituted fundamental error.[6] This was so even in light of sufficient evidence to permit a jury to infer beyond a reasonable doubt that defendant had the specific intent to kill the victim and aided his brother in the crime.

We are presented with the same situation in the case at hand. While the trial court's instruction correctly stated the law as it generally pertained to accomplice liability, the trial court's instruction fell short of adequately instructing the jury that the specific intent requirement for attempted murder, as properly set forth in the attempted murder instruction, also applied to accomplice liability for attempted murder. The accomplice liability instruction given to the jury defined accomplice liability as "knowingly or intentionally" aiding, inducing, or causing another person to commit an offense, and further defined the act of aiding as "to *knowingly* aid, support, help or assist in the commission of a crime." *Appellant's Appendix* at 146 (emphasis supplied).

---

5. Although not set forth in the opinion, we presume that the jury was properly instructed on the elements of attempted murder, as was the jury in this case. Indeed, the Court recognized the *Spradlin* rule and only analyzed it in terms of an accomplice liability instruction in a prosecution for attempted murder under an accomplice liability theory.

6. The Court noted that when the defendant's intent is not at issue, a *Spradlin* error does not rise to the level of fundamental error. *Hopkins v. State*, 759 N.E.2d 633.

Considering Tiller's testimony as to his involvement and his allegation that he removed himself from the situation when he learned that Cannon had been placed in the trunk of the car in conjunction with the State's evidence that Tiller ordered James and Looney to tie Cannon up, handed James a gun, and retrieved the car in which James and Looney placed Cannon in the trunk, it is clear that Tiller's intent was substantially at issue. We must therefore conclude, as did our Supreme Court in *Hopkins,* that the trial court's instruction on accomplice liability constituted fundamental error in that it failed to adequately instruct the jury that it was required to find that Tiller possessed the specific intent to kill Cannon when he aided, supported, helped, or assisted his accomplices commit the crime of attempted murder. *See also Williams v. State,* 737 N.E.2d 734, 740 (Ind.2000) (holding that "the trial court committed fundamental error in not instructing the jury that it had to find that Williams possessed the specific intent to kill when he knowingly or intentionally aided, induced, or caused his backseat accomplice to commit the crime of attempted murder").

2.

■ Tiller argues that all of his convictions should be reversed and the case remanded for re-trial because his right of confrontation, under both the Sixth Amendment of the Federal Constitution and article 1, section 13 of the Indiana Constitution, was violated when the trial court permitted Cannon's deposition to be read into evidence when Cannon failed to appear to testify at trial. Specifically, Tiller argues that the State did not make a reasonable effort to secure Cannon's appearance so as to support the trial court's conclusion that Cannon was unavailable.

■ In *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), the Supreme Court held that the Confrontation Clause of the Sixth Amendment to the Federal Constitution prohibits admission in a criminal trial of testimonial statements by a person who is absent from trial, unless the person is unavailable and the defendant had a prior opportunity to cross-examine the person. *See also Fowler v. State,* 829 N.E.2d 459 (Ind.2005), *cert. denied,* 547 U.S. 1193, 126 S.Ct. 2862, 165 L.Ed.2d 898 (2006), *abrogated on other grounds by Giles v. California,* —— U.S. ——, 128 S.Ct. 2678, 171 L.Ed.2d 488 (2008). With regard to unavailability, our Supreme Court has provided that "[a] witness is unavailable for purposes of the Confrontation Clause requirement only if the prosecution has made a good faith effort to obtain the witness's presence at trial." *Garner v. State,* 777 N.E.2d 721, 724 (Ind.2002). "Even if there is only a remote possibility that an affirmative measure might produce the declarant at trial, the good faith obligation *may* demand effectuation." *Id.* at 724–25 (emphasis in original). "Reasonableness is the test that limits the extent of alternatives the State must exhaust." *Id.* at 725.

The State explained its efforts to secure Canon's attendance. Four to five weeks prior to trial, the prosecutor spoke with Cannon about Tiller's upcoming trial and Cannon informed her that he did not want to testify because he was not happy that after testifying in Looney's trial, Looney was acquitted. Cannon further informed the prosecutor that he was afraid to testify. Two weeks prior to the trial, Cannon was served in hand with a subpoena to appear at the trial and the prosecutor verified that Cannon knew of the trial date. Also shortly before trial, Cannon cooperated by allowing an officer to take a swab for a DNA sample and at that time, gave no further indication that he was not going to cooperate and testify at Tiller's upcoming

trial. The prosecutor attempted to contact Cannon on the Friday before the trial was set to begin and was surprised to learn from Cannon's girlfriend that he had left town and perhaps had gone to Wisconsin where he had family. On Saturday, the prosecutor participated in a three-way call with Cannon and his girlfriend, during which Cannon stated that he did not want to testify because he was afraid. The prosecutor pleaded with Cannon and emphasized to him the importance of his testimony, even offering to pay for transportation. Also on Saturday, a detective tried to locate Cannon, but was unsuccessful. On Sunday, the prosecutor called Cannon's girlfriend, who informed the prosecutor that Cannon was no longer taking her calls. On the first day of trial, the trial court granted the State's motion for a writ of body attachment. Cannon, however, never appeared at the trial.

In considering the efforts utilized by the State, the trial court acknowledged Cannon's initial reluctance to testify, but further noted that Cannon's actions as the trial drew nearer, accepting in-hand service of the subpoena, cooperating by giving a DNA sample, and speaking with the prosecutor, indicated that Cannon would be present to testify at trial. The trial court recognized that "[i]t is not uncommon ... for witnesses to flim-flam back and forth in anticipation of trial," especially in light of the nature of the offense (i.e., that Cannon was shot in the face). *Transcript* at 37. Considering the circumstances, the trial court concluded that the

State's efforts were reasonable, and therefore permitted Cannon's deposition testimony to be read into evidence under Ind. Evidence Rule 804(a)(5), (b)(1).[7] We agree with the trial court's assessment and therefore conclude that the State's efforts in securing Cannon's appearance at trial were reasonable. The reading of Cannon's deposition testimony into evidence did not violate Tiller's Sixth Amendment right of confrontation.

■ Tiller also argues that his right of confrontation under the Indiana Constitution was violated. Tiller notes that the protections of individual rights under the Indiana Constitution are often more extensive and argues that "a finding of 'good faith unavailability' under the Indiana Confrontation Clause is more exact and demanding than the *Crawford* counterpart." *Appellant's* Brief at 14.

■ Article 1, section 13 provides: "In all criminal prosecutions the accused shall have the right to meet the witnesses face to face." Our Supreme Court has held:

Indiana's confrontation right contains both the right to cross-examination and the right to meet the witnesses face to face. It places a premium upon live testimony of the State's witnesses in the courtroom during trial, as well as upon the ability of the defendant and his counsel to fully and effectively probe and challenge those witnesses during trial before the trier of fact through

---

7. Evid. R. 804(a)(5) defines unavailability as including "situations in which the declarant ... is absent from the hearing and the proponent of a statement has been unable to procure the declarant's attendance by process or other reasonable means." Evid. R. 804(b)(1) provides:

(b) Hearsay Exceptions. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness.

(1) Former testimony. Testimony given as a witness at another hearing of the same or a different proceeding, or in a deposition taken in compliance with law in the course of the same or another proceeding, if the party against whom the testimony is now offered, or, in a civil action or proceeding, a predecessor in interest, had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination.

cross-examination. The defendant's right to meet the witnesses face to face has not been subsumed by the right to cross-examination. That is to say, merely ensuring that a defendant's right to cross-examine the witness is scrupulously honored does not guarantee that the requirements of Indiana's Confrontation Clause are met. The Indiana Constitution recognizes that there is something unique and important in requiring the face-to-face meeting between the accused and the State's witnesses as they give their trial testimony. While the right to cross-examination may be the primary interest protected by the confrontation right in Article I, § 13 of the Indiana Constitution, the defendant's right to meet the witnesses face to face cannot simply be read out of our State's Constitution.

*Brady v. State,* 575 N.E.2d 981, 988 (Ind. 1991). The Brady Court further noted, however, the right of confrontation is not absolute. *Brady v. State,* 575 N.E.2d 981. To be sure, where testimony is secured prior to trial and the defendant cross-examined the witness or was afforded the opportunity to cross-examine the witness and the witness is unavailable for purposes of trial, the testimonial evidence may be admissible. *See Brady v. State,* 575 N.E.2d 981. Circumstances giving rise to unavailability may be found where a witness has "died, become insane, or is permanently or indefinitely absent from the state and is therefore beyond the jurisdiction of the court in which the case is pending." *Brady v. State,* 575 N.E.2d at 987 (citing *Wilson v. State,* 175 Ind. 458, 93 N.E. 609 (1911)).

Tiller asserts this State's special emphasis on in-person testimony before the trier of fact and the accused and the circumstances of what may constitute unavailability set forth in *Brady, supra, (i.e.,* death, insanity, or permanently or indefinitely ab-

sent from the state), suggests that in Indiana, the State must make more than a "good faith" effort to obtain the witness's presence at trial. We disagree with Tiller that the standard under article 1, section 13 "is more exact and demanding than the *Crawford* counterpart." *Appellant's Brief* at 14.

In *Wilson v. State,* cited by our Supreme Court in *Brady,* the sheriff personally searched saloons and boarding houses in surrounding counties in a fruitless effort to locate a missing witness. Subpoenas issued for the missing witness were returned, "Not Found." The son of the missing witness did not know where his father could be located. The Supreme Court found this evidence sufficient to establish that the witness could not be found within the State by the exercise of reasonable diligence, noting:

> There was no direct evidence to show that Fenton, the absent witness, was at any place within the state, or, if he was, that he was in any of the counties into which the subpoenas had been sent for him or search made to discover his whereabouts. This being a criminal prosecution, the deposition of the witness could not be taken by the state and used upon the trial without appellant's consent. Under the circumstances, the state in the exercise of reasonable diligence, which the law exacted of it to find the witness if within the state, was not bound to issue subpoenas for him into each and all of the counties of the state, or to send persons throughout the state in order to discover where the witness might be found.

175 Ind. 458, 93 N.E. at 612.

This case is similar to that presented in *Wilson,* and the same result should obtain for the same reasons. Here, the State made every effort to procure Cannon's ap-

pearance at trial. Cannon, however, deliberately absented himself from all the places the State knew to look for him. Further, while Cannon appeared reluctant to testify four to five weeks prior to trial, in the weeks leading up to the trial, he seemed willing to testify, insofar as he accepted service of the subpoena to appear in-hand, cooperated by giving a DNA sample, and spoke with the prosecutor. There were no further indications that Cannon would not appear. As recognized by the trial court, it is not uncommon for a witness, especially in circumstances like the present, to "flim flam" about whether or not they are going to testify. *Transcript* at 37.

Two days prior to trial, the State learned that Cannon fled from Indiana, perhaps to Wisconsin, because he was in fear and did not want to testify. The prosecutor spoke with Cannon and implored him to appear and testify at trial, even offering to pay for his transportation, all to no avail. On the eve of trial, the prosecutor was unable to get in touch with Cannon and efforts to locate him proved unsuccessful. There is no indication in the record that in the face of a pending trial against Tiller that Cannon would return to Indiana. In the words of our Supreme Court in *Wilson*, Cannon proved to be "indefinitely absent from the state." *See Brady v. State*, 575 N.E.2d at 987. We therefore conclude the State established that, given the circumstances, it made a good faith effort and employed sufficient measures to secure Cannon's attendance at trial. *Cf. Ingram v. State*, 547 N.E.2d 823 (Ind.1989) (finding that State made a suffi-cient showing that witness was unavailable where witness did not respond to subpoena; detective inquired at her last known address, her place of employment, foster home where her children lived, her parents and an aunt and uncle, and various business establishments likely to have contact with her); *Hammers v. State*, 502 N.E.2d 1339 (Ind.1987) (finding State established witness was unavailable to testify where a warrant had been issued for his arrest, that diligent efforts were made to produce him, and that family members advised he was in Tennessee but did not know how to contact him).

We reject Tiller's suggestions regarding what more the State could have done to secure Cannon's appearance at trial. On appeal, Tiller asserts that the State could have subpoenaed Cannon to a pre-trial conference and asked the trial judge to admonish him about appearing at trial to testify. Tiller further suggests that if Cannon had failed to appear for the pre-trial, the court could have obtained a body attachment and the search for him begun.[8] Finally, Tiller argues that the State could have requested a continuance of the jury trial in order to have more time to locate Cannon.[9] The realities are that an admonishment from the trial judge would not have guaranteed Cannon's appearance at trial. Moreover, although Cannon had seemed reluctant to testify, the State believed that Cannon would in fact testify against Tiller, as he did against Tiller's co-defendant, and was surprised when it learned that Cannon absented himself from all places the State knew to find him

---

**8.** Tiller's trial counsel suggested that the State should have issued a body attachment and put Cannon in jail prior to trial in order to secure his attendance at trial.

**9.** The State requested a ruling from the trial court on whether Cannon's deposition could be used in lieu of his testimony and indicated that if the court ruled that the deposition could not be used, the State would request a continuance. Tiller's trial counsel suggested that if the State requested a continuance for additional time to locate Cannon, that Tiller would have objected thereto.

on the eve of trial. Under the circumstances, a continuance would not have proved helpful as Cannon had absented himself from the State's jurisdiction because he was in fear and did not want to testify and there was no indication Cannon would ever return to this State.

### 3.

Tiller argues that the evidence is insufficient to support his conviction for attempted murder. When considering a challenge to the sufficiency of evidence to support a conviction, we respect the factfinder's exclusive province to weigh the evidence and therefore neither reweigh the evidence nor judge witness credibility. *McHenry v. State,* 820 N.E.2d 124 (Ind. 2005). We consider only the probative evidence and reasonable inferences supporting the verdict, and "must affirm 'if the probative evidence and reasonable inferences drawn from the evidence could have allowed a reasonable trier of fact to find the defendant guilty beyond a reasonable doubt.'" *Id.* at 126 *(quoting Tobar v. State,* 740 N.E.2d 109, 111–12 (Ind.2000)).

To convict Tiller of attempted murder under the theory of accomplice liability, the State was required to prove beyond a reasonable doubt that Tiller, with the specific intent that the killing occur, knowingly or intentionally aided, induced, or caused his accomplices to commit the crime of attempted murder. *See Bethel v. State,* 730 N.E.2d 1242. Tiller asserts that there is "absolutely no proof" that he had the specific intent that James and Looney kill Cannon. *Appellant's Brief* at 19. We disagree. We need not here recount in detail the State's evidence as set forth above. Suffice it to say, reasonable inferences could be drawn from the evidence presented from the State that Tiller intended for James and Looney to kill Can-

non. We therefore remand for a re-trial on the charge of attempted murder.

Judgment reversed and remanded.

DARDEN, J., and BARNES, J., concur.