**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED
Oct 25 2013, 5:51 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**VICTORIA L. BAILEY**
Marion County Public Defender
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**RYAN D. JOHANNINGSMEIER**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| MICHAEL GREY, ) | |
| ) | |
| Appellant-Defendant, ) | |
| ) | |
| vs. ) | No. 49A05-1303-CR-132 |
| ) | |
| STATE OF INDIANA, ) | |
| ) | |
| Appellee-Plaintiff. ) | |

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable Kurt Eisgruber, Judge
Cause No. 49G01-1201-FA-4948

**October 25, 2013**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**FRIEDLANDER, Judge**

Michael Grey appeals from his convictions of six counts of class A felony Child Molesting,[1] six counts of class B felony Child Molesting,[2] and two counts of class C felony Child Molesting.[3] Grey presents the following issue for our review, which we restate as: Did the trial court abuse its discretion by admitting into evidence the videotaped deposition testimony of a minor victim after concluding that the witness was unavailable to testify at trial because of her return with her family to American Samoa?

We affirm.

Grey was born in American Samoa in 1955 and lived in California from 1977 through 2006, at which time he moved to Indianapolis. A friend had told Grey about the Faitele family, who were also American Samoans, and the Faiteles and Grey later became close friends. The Faitele family consisted of Faitele Faitele, who was pastor of his church, his wife, Naia, their adult daughter, Naia, and Naia's four daughters, G.N., who was born on January 13, 1995, K.N., who was born on August 7, 1998, P.N., who was born on March 17, 2002, and H.N., who was born on August 25, 2003. Grey stayed with the Faiteles when he visited Indianapolis, and moved in with them in 2006, when he decided to live in Indianapolis. Grey had stayed with the Faiteles for two or three months before his wife, Vernita, joined him there. In December 2006, Vernita's adult daughter, Moana Westerlund, also moved to Indianapolis and stayed with her mother and the Faitele family.

---

[1] Ind. Code Ann. § 35-42-4-3(a)(1) (West, Westlaw current with all 2013 legislation).
[2] I.C. § 35-42-4-3(a).
[3] I.C. § 35-42-4-3(b).

Grey became an assistant pastor at Faitele's church and directed the church music program. As an assistant pastor, Grey was referred to as "Reverend," and that position gained him respect and trust from Naia's daughters and the other Faitele family members. Given the American Samoan cultural tradition of respect for their elders, Grey was referred to as "Uncle" by Naia and her daughters, even though they were not blood relatives. Vernita was referred to by Naia as "Auntie" and the girls referred to her as "Grandma." Naia's girls referred to Moana as "Auntie Mo." In sum, Grey's relationship with the Faitele family was "just like a family." *Transcript* at 361.

After living with the Faitele family for approximately one year, Grey, Vernita, and Moana moved to a rental home. During May 2011, A.P., Grey's niece, moved to Indianapolis from American Samoa to attend school. While here, A.P. lived with Grey and Vernita. Moana became the youth minister for the Faiteles' church, and was the adult the girls would seek out. On January 21, 2012, Moana had just returned from a trip when A.P. told her that she needed to tell her something. Moana described A.P.'s demeanor as scared, nervous, and crying. After A.P. disclosed information about inappropriate sexual behavior between her and Grey, Moana spoke with P.N., who was also described as scared and crying. P.N. told her about inappropriate sexual behavior between her and Grey.

Upon Vernita's return home, Moana told her what she had learned from the girls. Moana then spoke with K.N. and G.N. Moana decided to speak with Grey prior to contacting law enforcement officers. Vernita called Grey and learned that he was on his way home from work. Moana then walked to the garage where she called the police. Upon

returning to the house, she saw that Grey had arrived home. Moana confronted Grey, who did not deny the allegations, but responded by asking who had made the allegations. Police officers arrived shortly thereafter.

A.P., P.N., G.N., and K.N. were taken to the Marion County Child Advocacy Center. Indianapolis Metropolitan Police Department Detective Eli McAllister interviewed the girls. Based upon the information he learned during those interviews, Detective McAllister placed Grey under arrest and the State filed charges against Grey. H.N. was interviewed by a child forensic interviewer on January 24, 2012. Additional charges were subsequently filed against Grey.

On August 9, 2012, the State filed a verified petition to perpetuate testimony by deposition with respect to A.P. At a pretrial conference held on August 27, 2012, the parties agreed that the deposition would occur on August 31, 2012. The trial court had previously deferred its ruling on the State's motion until after the deposition had been taken.

Prior to trial on February 11, 2013, the trial court granted, over Grey's objection, the State's verified petition to perpetuate testimony. The trial court granted Grey's motion to sever certain counts filed against him. A jury trial was held regarding the first fourteen counts against Grey on February 11, 2013. The jury returned guilty verdicts on each of those counts. After merging two counts with other remaining counts, the trial court entered a judgment of conviction and entered its sentencing order. The counts that had been severed for purposes of trial were dismissed by the State.

Grey now appeals, contending that each of his convictions must be reversed due to the trial court's allegedly erroneous admission of A.P.'s videotaped deposition into evidence. Grey asserts that the trial court abused its discretion by concluding that A.P. was unavailable for purposes of determining the admissibility of the deposition under the analysis set out in *Crawford v. Washington*, 541 U.S. 36 (2004). He claims that "the record is absent any indication [the] State made a good faith effort to secure A.P.'s attendance at trial." *Appellant's Brief* at 7. Grey argues that "A.P.'s inadmissible testimonial hearsay worked to enforce the girls' credibility as yet another witness telling a similar story—the more witness[es] who tell the same story, the more likely it is to be true[]" and that the presentation of the girls as a "package of victims" likely "infect[ed] and influence[d] Grey's entire trial." *Id*. at 9. As such, Grey argues that the allegedly erroneous decision to admit the evidence was not harmless, and requires a complete reversal of his convictions.

"Where testimonial evidence is at issue . . . the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination." *Crawford v. Washington*, 541 U.S. at 68. Here, neither side contends that A.P.'s videotaped deposition is not testimonial. Nor is the fact that Grey and his counsel were present for A.P.'s deposition and had the opportunity for cross-examination in dispute. The point of contention here is the determination that A.P. was unavailable for trial.

The trial court was required to make the factual determination whether A.P. was unavailable. "As a general rule, when the admission of evidence is predicated on a factual determination by the trial court, we review under a clearly erroneous standard of review."

5

*Candler v. State*, 837 N.E.2d 1100, 1103 (Ind. Ct. App. 2005) (citing *Davenport v. State*, 749

N.E.2d 1144, 1148 (Ind. 2001)).  Justice Boehm characterized the standard of review in a

case involving factual findings as follows:

> Trial courts do not, however, have "discretion" to make findings.  Rather, trial courts are to use their best judgment to arrive at the correct result.  They are bound by the law and the evidence and it is usually an error, not an "abuse" if the appellate court disagrees.  Trial courts must of course exercise judgment, particularly as to credibility of witnesses, and we defer to that judgment because the trial court views the evidence first hand and we review a cold documentary record.  Thus, to the extent credibility or inferences are to be drawn, we give the trial court's conclusions substantial weight.  But to the extent a ruling is based on an error of law or is not supported by the evidence it is reversible, and the trial court has no discretion to reach the wrong result.

*Pruitt v. State*, 834 N.E.2d 90, 104 (Ind. 2005).

"A witness is unavailable for purposes of the Confrontation Clause requirement only

if the prosecution has made a good faith effort to obtain the witness's presence at trial."

*Garner v. State*, 777 N.E.2d 721, 724 (Ind. 2002).  "Reasonableness is the test that limits the

extent of alternatives the State must exhaust."  *Tiller v. State*, 896 N.E.2d 537, 543 (Ind. Ct.

App. 2008) (quoting *Garner v. State*, 777 N.E.2d 721, 724 (Ind. 2002)).

> Even though Trial Rule 32(A) permits use of an absent witness's deposition testimony if the court finds that the "witness is outside the state, unless it appears that the absence of the witness was procured by the party offering the deposition," we have previously determined that this trial rule is not applicable to claims involving a violation of the defendant's Sixth Amendment right of confrontation.  The issue is not whether the witnesses were out-of-state at the time of trial, but whether the State made a good faith effort to obtain the absent witnesses' attendance at trial.

*Garner v. State*, 777 N.E.2d 721, 724 (Ind. 2002) (internal citation omitted).

The following discussion took place before the start of the first day of Grey's jury trial:

[Defense]:    Also, Judge, we did object when the State brought in AP some months to go take a videotaped deposition. We felt like that also denied the Defendant his right to confrontation, that the –you couldn't possibly know all the facts at the time that deposition was taken for purposes of cross-examination, that the jury would not be able to observe her demeanor in the courtroom. And for all those reasons, we are opposed to the State being allowed to play that videotaped deposition.

[The Court]:  Would you like to make a record on that, State?

[The State]:  Yeah, I would. Yes, Your Honor, I would. I guess the circumstances have changed since we were here last on that issue in that AP, to the best of the State's knowledge, I believe, is no longer in the United States. If you recall, AP, who is the Defendant's niece, was here along with her other sister who is also a minor, to attend schools here in the United States and staying with the Defendant. And after this, after the Defendant's pretrial incarceration and his wife's leaving the state, she was effectively left with nowhere to live, and the Department of Child Services placed her in the home of the Faiteles, who are the grandparents of the victim, for temporary—they were to leave the country in June of 2012.

I, essentially, the day before they were to leave, I had their plane tickets cancelled because of the need for AP to testify at trial. There was an agreement that was came[sic] into between the State and Mr. Kowalski, predecessor counsel for Mr. Grey, that we would have this case tried on the August date.

In the interim, Mr. Kowalski left the agency and Mr. Alden was appointed and did not feel that he needed to live up to that agreement and asked for a continuance. I informed the Court that the girls had plane tickets to go back to their family and their mother, who was in the hospital in American Samoa.

That is, in fact, what happened. They are not here with the Faiteles. I do not believe that they are here. From my understanding,

7

Sonya Parker, the Department of Child Services, they were sent back and reunited with their family in Samoa. I say *they*. I mean AP and her sister. AP is the only witness that is –we secured her pretrial deposition on video in this courtroom, where the Defendant was provided a chance to cross-examine and was here in person with his—with counsel, and we've taken that. We have that on video, and that's been done.

And as to the best of the State's knowledge and from all good faith trying to find out, I believe that she is not here in the state or the country.

[The Court]: Okay. And the Court recalls these discussions. You mentioned two, AP, but the other person was not at all involved in this case[?]

[The State]: Yes. And I say *they*, because it was two children. Thank God it was---she was interviewed by the Department of Child Services but did not disclose any molest.

[The Court]: All right.

[The State]: By the Defendant.

[The Court]: And the Court does recall the discussions concerning AP and will stand by its previous ruling that under the circumstances, she is a minor, her home is in American Samoa, that it was not appropriate to keep her here in the United States. The Defendant was offered the opportunity to cross-examine her.

And I do appreciate that they were less than ideal circumstances, however, I do find that she is unavailable and that her testimony can be played to the jury.

*Transcript* at 4-7 (emphasis in original). Defense counsel had argued that A.P. was not unavailable and that there was no evidence in the record that she was either unwilling or unable to return to Indiana for the trial.

8

Looking at the record of the State's efforts to secure A.P.'s presence for trial, we agree with the trial court's conclusion that the State made a reasonable effort to secure A.P.'s presence. The State did not procure A.P.'s absence. To the contrary, the State cancelled the family's reservations to return to American Samoa so that A.P. would be available for the August trial date. When Grey's new trial counsel requested a continuance and refused to honor the previous agreement entered into by predecessor counsel, the trial court agreed that it would be unreasonable to force A.P., a minor, to remain in Indiana, when her family and her home were in American Samoa. The State also noted its uncertainty that the subpoena power it possessed, if any, would be recognized or honored by law enforcement in American Samoa. Additionally, the State had cited as support for the videotaped deposition A.P.'s parents' likely reluctance to allow her to return to Indiana for a later trial date. "The issue is not whether the witnesses were out-of-state at the time of trial, but whether the State made a good faith effort to obtain the absent witnesses' attendance at trial." *Garner v. State*, 777 N.E.2d 721, 724 (Ind. 2002). We find no clear error in the trial court's decision that the State made a good faith effort and that A.P. was unavailable for trial.

Even if we were to find clear error in the trial court's conclusion, that error would amount to harmless error as to the remaining counts not involving A.P. "[B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." *Chapman v. California*, 386 U.S. 18, 24 (1967). A.P.'s videotaped deposition concerned only the allegations of inappropriate sexual behavior between her and Grey. She did not offer any evidence pertaining to the allegations against

9

Grey as to the other girls, who testified in person at trial. Thus, the trial court's admission of the deposition would not have had an impact on the convictions related to the other victims. There was independent evidence to support those convictions. If the trial court's decision to admit A.P.'s deposition was erroneous, it was harmless error beyond a reasonable doubt with respect to the convictions involving the other victims, and those convictions would not be subject to reversal.

Judgment affirmed.

BAKER, J., and VAIDIK, J., concur.