Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED
Nov 24 2014, 9:34 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**SCOTT KING**
Scott King Group
Merrillville, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**MONIKA PREKOPA TALBOT**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| ROBERT C. TILLER, | ) | |
| | ) | |
| Appellant-Petitioner, | ) | |
| | ) | |
| vs. | ) | No. 45A03-1405-PC-163 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Respondent. | ) | |

APPEAL FROM THE LAKE SUPERIOR COURT
The Honorable Salvador Vasquez, Judge
The Honorable Kathleen A. Sullivan, Magistrate
Cause Nos. 45G01-1110-PC-10 and 45G01-1110-PC-11

**November 24, 2014**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**NAJAM, Judge**

## STATEMENT OF THE CASE

Robert C. Tiller appeals the post-conviction court's denial of his petition for post-conviction relief. Tiller raises a single issue for our review, namely, whether he was denied the effective assistance of trial counsel. We affirm.

## FACTS AND PROCEDURAL HISTORY

The facts underlying Tiller's convictions were stated by this court in his first direct appeal:

The facts most favorable to the convictions follow. On December 24, 2005, fifteen-year-old T.T. was staying at Willow Glen Academy, a home for troubled teens. While talking on the phone, T.T. asked her direct care counselor, Zatia Sain, to take the phone, upon which Sain spoke with Tiller, T.T.'s brother. After several additional phone calls and a face-to-face meeting with Tiller, Sain agreed to help T.T. leave the secure facility given Tiller's threat to enter the building and kill everyone inside. The initial plan to have T.T. get out of the building was interrupted when other adults noticed that T.T. had thrown her possessions out the window. Notwithstanding the foiled plan, T.T.'s boyfriend, Louis James, armed with a silver revolver, entered through the secured front door that had been left ajar for T.T.'s exit and yelled for T.T. Shortly after 7:00 p.m., Brandon Peterman, a counselor at Willow Glen, was confronted by James, who told Peterman not to move or "it would be over for [him.]" T.T. left the building with James.

About 10:00 p.m., Tiller, James, T.T., and another individual, Korey Looney, arrived at the home of Angela Arriaga, a friend of Tiller's. Arriaga and her four children were not present when the foursome arrived, but Arriaga's fiancé, Richard Cannon, was at the home watching television. Tiller asked Cannon if T.T. could stay at the house for a few days, and Cannon told him "no[.]" Tiller continued to ask Cannon if T.T. could stay, and then eventually asked Cannon if that was his final answer, and Cannon said "yes, that's my final answer[.]" Tiller then directed James and Looney to "tie this mother-fucker up[.]" The two men beat Cannon about the face as he resisted. Tiller was also involved in this altercation with Cannon. Finally, Tiller handed James a .38 caliber silver revolver, and James held the gun to Cannon's head. With Cannon subdued, James and Looney tied Cannon up with shoelaces from his own shoes, wrapped him in a blanket, and put him in the trunk of the car Tiller brought to the house. As they

2

drove, Cannon managed to free his feet and remove the gag from his mouth. When the car stopped, James and Looney pulled Cannon from the trunk, James shot him one time in the face and left him on the ground. After the men left, Cannon managed to get to a nearby house, where help was summoned. Cannon did not see Tiller at the scene of the shooting.

Shortly after 11:00 p.m., Arriaga arrived home with her four children and found T.T. attempting to clean up. Arriaga soon left to make phone calls in an attempt to find Cannon. While out, she encountered Tiller in a car with James and Looney. Tiller told Arriaga to go home, and he arrived shortly thereafter. He asked Arriaga if T.T. could stay at her home, and Arriaga initially said no. After further urging from Tiller, Arriaga reluctantly agreed. Police eventually recovered a .38 caliber revolver at 1357 Johnson Street, a place where Tiller, Johnson, and Looney had stayed.

At trial, Tiller claimed that he did not participate in helping T.T. escape from Willow Glen. Tiller also testified that he was not involved in a fight with Cannon at Arriaga's residence. Tiller further testified that he was not aware that James and Looney had placed Cannon in the trunk of the car and that when he found out about it, he said, "I don't have nothing to do with this" and got out of the car.

On December 30, 2005, the State charged Tiller with Count I, attempted murder as a class A felony; Count II, confinement as a class B felony; Count III, aggravated battery as a class B felony; and Count IV, battery as a class C felony. On January 6, 2006, under a separate cause, the State charged Tiller with escape as a class B felony (Count V). On October 4, 2006, the trial court joined the two causes pursuant to the State's motion. A five-day jury trial commenced on November 5, 2007. At the conclusion of the evidence, the jury found Tiller guilty as charged. On January 23, 2008, the trial court sentenced Tiller to an aggregate sentence of sixty-six years.

Tiller v. State, 896 N.E.2d 537, 539-41 (Ind. Ct. App. 2008) (citations omitted; some alterations original).

In his first direct appeal, we reversed Tiller's conviction for attempted murder due to an erroneous jury instruction and remanded for a new trial. On remand, the State moved the court to enter judgment instead on Count III, aggravated battery, and the court

3

entered its judgment and sentenced Tiller accordingly. Following a second direct appeal, we affirmed Tiller's convictions and sentence.

On October 21, 2011, Tiller filed his petition for post-conviction relief. Among other things, Tiller alleged that he had been denied the effective assistance of trial counsel because his counsel, John Davis, had failed to hold a pretrial interview with James, Tiller's co-defendant. Tiller further alleged that, had Davis interviewed James, Davis would have learned that James would have presented exculpatory testimony in favor of Tiller.

After several evidentiary hearings, on this issue the post-conviction court entered the following findings of fact:

> 8. During the investigation of this case, co-defendant Louis James made a prior statement to Gary Police Department Detective Bond stating that [t]he petitioner[ "]gave me [James] the gun[] and told me to take the body [Cannon] somewhere and shoot him." After his guilty plea and sentencing, Mr. James was listed as a witness for the State, and [he] was produced from the Department of Correction for both co-defendant James Looney's trial[] and for the petitioner's trial. Mr. James was in the Lake County Jail[] and available to testify throughout the petitioner's trial, but neither the State nor the defense called him.

> * * *

> 17. [Then-deputy prosecutor Lisa] Beck testified at the post-conviction relief hearing that[,] prior to the jury trial of Looney, the State . . . met with Mr. James on multiple occasions. During those meetings, Mr. James never told the State anything contradictory to his prior statements[;] however[,] he always maintained that he would not testify at the trial of [t]he petitioner. She said that she again met with Mr. James during the week of the petitioner's trial, and Mr. James again reiterated to the State that he would not testify against the petitioner because he was afraid of him. She further testified that at no point in time did Mr. James indicate to . . . her that his prior statements concerning the petitioner's involvement were coerced or untrue. Ms. Beck recounted an incident where the petitioner had yelled at Mr. James while both parties were being held in the Lake County

4

Jail during the week of the petitioner's trial. Beck also stated that all parties were aware of the conversation she had with Mr. James while he was in the Lake County Jail during the petitioner's trial.

Appellant's App. at 86, 88 (some alterations original; citations omitted). The court then entered the following relevant conclusions of law:

14. The petitioner raises two issues regarding the testimony of his co-defendant, Louis James. First, he alleges that counsel was ineffective for failing to depose and call Mr. James to testify at the petitioner's trial. . . . The Court notes that [this] issue was [not] raised in the petition for post-conviction relief, but substantial testimony was received . . . and both parties addressed [it] in their proposed findings. Therefore, the court will likewise address [this issue].

15. The decision about whether to call a particular witness at trial is a matter within the trial counsel's strategy. . . . Mr. Davis was familiar with the prior statements that Mr. James had made to police officers completely inculpating the petitioner. According to the testimony of Ms. Beck, Mr. James had consistently stated that he would not testify against the petitioner because he was afraid of him. Additionally, Ms. Beck stated that Mr. Davis was aware . . . on the third day of the petitioner's trial, after she met with Mr. James in the jail, the petitioner went to the pod in the jail where Mr. James was being held[] and screamed at Mr. James' cell. A correctional officer from the jail was available to testify to this.

16. Had Mr. Davis call[ed] Mr. James to testify, and had Mr. James, in fact, testified that the petitioner was not involved in any of the charged offenses, Mr. Davis was well aware that the State had substantial evidence with which to impeach Mr. James' testimony. Mr. Davis strategically did not call Mr. James as a witness, testifying at the post-conviction relief hearing that several factors went into the decision as to whether to call Mr. James. Mr. Davis further stated it was risky[] and could have come back to "bite us." The decision not to call Mr. James was a strategic one, and his testimony lacked sufficient credibility for the Court to find that the testimony would have altered the outcome of this trial.

17. The petitioner has failed to meet his burden of proving that he was denied the effective assistance of trial counsel.

Id. at 91. The court then denied Tiller's petition for post-conviction relief. This appeal ensued.

## DISCUSSION AND DECISION

Tiller appeals the post-conviction court's denial of his petition for post-conviction relief. Our standard of review in such appeals is clear:

> [The petitioner] bore the burden of establishing the grounds for post-conviction relief by a preponderance of the evidence. See Ind. Post-Conviction Rule 1(5); Timberlake v. State, 753 N.E.2d 591, 597 (Ind. 2001). Post-conviction procedures do not afford a petitioner with a super-appeal, and not all issues are available. Timberlake, 753 N.E.2d at 597. Rather, subsequent collateral challenges to convictions must be based on grounds enumerated in the post-conviction rules. Id. If an issue was known and available, but not raised on direct appeal, it is waived. Id. If it was raised on appeal, but decided adversely, it is res judicata. Id.
>
> In reviewing the judgment of a post-conviction court, appellate courts consider only the evidence and reasonable inferences supporting the post-conviction court's judgment. Hall v. State, 849 N.E.2d 466, 468 (Ind. 2006). The post-conviction court is the sole judge of the evidence and the credibility of the witnesses. Id. at 468-69. Because he is now appealing from a negative judgment, to the extent his appeal turns on factual issues [the petitioner] must convince this court that the evidence as a whole leads unerringly and unmistakably to a decision opposite that reached by the post-conviction court. See Timberlake, 753 N.E.2d at 597. We will disturb the decision only if the evidence is without conflict and leads only to a conclusion contrary to the result of the post-conviction court. Id.

Lindsey v. State, 888 N.E.2d 319, 322 (Ind. Ct. App. 2008), trans. denied.

Tiller contends that he was denied the effective assistance of trial counsel in violation of the Sixth Amendment to the United States Constitution. Specifically, he argues that his trial counsel did not adequately investigate potential exculpatory evidence, namely, James' testimony.[1] A claim of ineffective assistance of counsel must satisfy two components. Strickland v. Washington, 466 U.S. 668 (1984). First, the defendant must show deficient performance: representation that fell below an objective standard of

---

[1] We agree with the post-conviction court that Tiller preserved this issue for our review when the parties presented substantial evidence on it during the evidentiary hearings before the post-conviction court, which enabled the court to fully hear and adjudicate the issue.

6

reasonableness, committing errors so serious that the defendant did not have the "counsel" guaranteed by the Sixth Amendment. Id. at 687-88. Second, the defendant must show prejudice: a reasonable probability (i.e., a probability sufficient to undermine confidence in the outcome) that, but for counsel's errors, the result of the proceeding would have been different. Id. at 694.

"[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." Id. at 690. Further:

> strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

Id. at 690-91.

Tiller did not receive ineffective assistance from his trial counsel. "[A]pplying a heavy measure of deference" to Davis' decision not to investigate James' likely testimony before trial, we cannot say that the post-conviction court erred when it determined that Davis' decision was reasonable under all the circumstances. Id. at 691. The post-conviction court found that Davis "was familiar with the prior statements that Mr. James had made to police officers completely inculpating the petitioner." Appellant's App. at 91. The post-conviction court further found that Davis knew that, during Tiller's trial, Tiller had intimidated James in the Lake County jail. Id. In light of

7

those undisputed facts, we agree with the post-conviction court's conclusion that, "had Mr. James, in fact, testified that [Tiller] was not involved in any of the charged offenses, Mr. Davis was well aware that the State had substantial evidence with which to impeach Mr. James' testimony." Id. Thus, Davis made a reasonable strategic decision to avoid having the impeachment evidence placed in front of the jury.

In support of his argument to the contrary on appeal, Tiller substantially relies on United States ex rel. Hampton v. Leibach, 347 F.3d 219 (7th Cir. 2003). But Hampton is inapposite. In that case, at a late-night rhythm-and-blues concert at a Chicago venue:

> a group of up to forty individuals marched up the aisle toward the stage, chanting "Black Gangster Disciples" and "Third World Disciple Nation," pounding their fists together, and making gang signals with their hands. Three Latino concertgoers—Hugo N., Martha N., and Denise M.—were seated in the fifth row of the theater. As they arose from their seats and attempted to leave, the group in the aisle attacked them, removing their clothes, taking their wallets and jewelry, beating them, and sexually assaulting the two women. Security guards eventually intervened and rescued the three victims of the assault. None of the perpetrators was detained at the scene.

Id. at 221-22 (footnote omitted). Hampton was later charged and convicted as one of the perpetrators. His trial counsel made no attempt to obtain potentially exculpatory witness testimony, even though, "[w]ith no physical evidence against Hampton, the prosecution's case against him depended entirely on witnesses who testified that they saw him participate in the attacks. Those witnesses saw the assailant they identified as Hampton only briefly and under difficult circumstances, rendering their identifications of Hampton vulnerable to challenge." Id. at 253.

Those facts are a far cry from Tiller's case. Here, among other things, the victim's deposition testimony identifying Tiller was before the jury. And James' putative

8

testimony would not have clarified ambiguous observations; his testimony would have been wholly inconsistent with his prior, unambiguous statements implicating Tiller, and James would have been readily impeached.

We also reject Tiller's argument on appeal that the post-conviction court "engaged in pure speculation when it found that Davis's decision not to call James was a matter of trial strategy" because Davis did not expressly testify to the post-conviction court that it was his trial strategy. Appellant's Br. at 12. But Tiller's reading of the record is not accurate. While Davis testified that he did not know "whether that was [his] strategy," he also testified that he remembered calling James as a witness to be "very risky" precisely because it would allow the jury to hear "something that really nail[ed] my client." Tr. at 47. Thus, the record supports the post-conviction court's finding that Davis' decision was a strategic one.

Neither can Tiller demonstrate that the result of his trial would have been different had his counsel interviewed James before trial. Tiller's argument on prejudice presumes James' testimony at trial would have been credible. But the post-conviction court expressly found that James "lacked . . . credibility" in light of his inconsistent statements. Id. We are in no position to reweigh the evidence on appeal. We affirm the post-conviction court's denial of Tiller's petition for post-conviction relief.

Affirmed.

BAILEY, J., and PYLE, J., concur.

9