## WILSON v. THE STATE OF INDIANA.

[No. 21,677. Filed January 11, 1911. Rehearing denied April 18,
1911.]

1. EVIDENCE.—*Testimony at Former Trial.—Admissibility.—Ab-
sent Witnesses.—Constitutional Law.*—The admission of the tes-
timony of an absent witness, given at a former trial, where the
defendant had an opportunity to cross-examine, and did cross-
examine, such witness, does not violate article 1, §13, of the Con-
stitution, providing that "in all criminal prosecutions the ac-
cused shall have the right * * * to meet the witnesses face
to face," full proof being first introduced showing that such wit-
ness could not be found.  p. 461.

2. EVIDENCE.—*Testimony at Former Trial.—Death.—Insanity.—
Absence from State.—Criminal Law.*—The testimony of a witness
at a former trial of a criminal case is admissible in a subsequent
trial, where such witness is dead, insane, or has left the State.
p. 465.

3. EVIDENCE.—*Testimony at Former Trial.—Admissibility.—Dis-
cretion.—Abuse.—Appeal.*—The admission of the testimony at a
former trial of an absent witness is largely discretionary with

the trial judge, whose decision can be reviewed only for abuse of such discretion.   p. 466.

4.   EVIDENCE.—*Testimony at Former Trial.—Absence of Witness.—Homicide.*—In a prosecution for homicide, where the evidence shows that a material witness for the State has departed to parts unknown, and that after diligent search he cannot be located, the admission of his testimony given at a former trial of the case does not constitute an abuse of discretion.   pp. 466, 467.

5.   CRIMINAL LAW.—*Depositions.—Taking of.*—Depositions in a criminal case can be taken and used only with the consent of the defendant.   p. 467.

6.   EVIDENCE.—*Testimony at Former Trials.—Admission.*—The testimony of a witness given at the second trial of a homicide case may be introduced by the State without introducing that given at the first trial thereof, the defendant having the right to introduce that given at the first trial, if there be any conflict.   p. 467.

7.   CRIMINAL LAW.—*Argument to Jury.—New Point in Reply.—Insanity of Witness.*—Where the prosecuting attorney, in his argument in reply, for the first time stated that the evidence of one of defendant's witnesses showed that such witness was insane, and the defendant moved for leave to reply thereto on the ground that such argument stated a "new point" (§2136 Burns 1908, subd. 4, Acts 1905 p. 584, §260), the overruling of such motion was not erroneous on such ground, nor would it be harmful, if erroneous, where the court afterward instructed the jury not to consider it.   pp. 468, 469, 470.

8.   CRIMINAL LAW.—*Argument to Jury.—Motions Concerning.—How Made part of Record.—Bills of Exceptions.—Appeal.*—A motion for leave to reply to the closing argument by the State in a criminal case, and the ruling thereon, cannot be brought into the record on appeal by inserting them in the bill of exceptions containing the evidence.   p. 469.

9.   JURY.—*Arguments to.—Inferences from Evidence.—Appeal.*—The jury has the sole right to draw inferences from conflicting testimony, and the presumption is that arguments unsupported by facts do not influence the jury's verdict.   p. 470.

10.   CRIMINAL LAW.—*Evidence.—Sufficiency.—Appeal.*—In reviewing the evidence in a criminal case, on appeal, the Supreme Court will consider only such as is favorable to the verdict.   p. 471.

11.   HOMICIDE.—*Evidence.*—Evidence showing that a husband and his wife had frequent violent quarrels, that she was insured in his favor, that she was murdered one forenoon, that he raised an alarm, that an iron poker was found in the stove, with fresh blood upon it, that he made conflicting statements concerning the matter, that when put into jail he tore pieces from his cloth-

ing containing human blood stains, that his handkerchief contained blood stains and that he tried to wash them out, that she was found lying upon the bed, but there was a large pool of blood upon the floor by the bed, that her head had been crushed by a blow, that no theft nor rape had been committed, and that defendant had written anonymous letters accusing and threatening others, sustains a verdict that the husband was guilty of the crime. p. 471.

12. CRIMINAL LAW.—*Appeal.*—*Weighing Evidence.*—The Supreme Court will not weigh conflicting evidence in a criminal case. p. 477.

13. HOMICIDE.—*Evidence.*—*Question for Jury.*—Where the evidence in a homicide case is of such a character that two opposing inferences may be drawn therefrom, the question of guilt or innocence is for the jury. p. 477.

From Fayette Circuit Court; *George L. Gray,* Judge.

Prosecution by The State of Indiana against John Wilson. From a judgment of conviction, defendant appeals. *Affirmed.*

*C. S. Roots* and *D. W. McKee,* for appellant.

*James Bingham,* Attorney-General, *F. M. Edwards,* Prosecuting Attorney, *A. G. Cavins, E. M. White* and *W. H. Thompson,* for the State.

JORDAN, J.—Appellant was charged by an indictment returned by the grand jury of the Fayette Circuit Court with murder in the first degree. The crime is alleged to have been committed in Fayette county, Indiana, on March 3, 1909, the person murdered being the wife of the accused. On a trial by jury he was found guilty of murder in the second degree, as charged in the indictment, and, over his motion for a new trial, was sentenced by the court to imprisonment in the Indiana state prison during life. The record discloses that appellant has been tried three times: On the first trial the jury failed to agree; at the second, it found him guilty of murder in the first degree, but a new trial was awarded to him by the trial court, which resulted as hereinbefore stated.

The only error assigned is that the court erred in overruling appellant's motion for a new trial. The reasons assigned in the motion for a new trial—and discussed by his

counsel in this appeal—are that the court erred in permitting the State to read in evidence exhibit nine, which was the stenographer's longhand report of the evidence of William Fenton, a witness in behalf of the State, as given by said witness on the second trial of this cause. The ruling of the court in permitting this evidence to go before the jury is assigned in various ways in the motion for a new trial. Finally it is assigned therein that the court erred in overruling the motion of defendant to strike out the evidence embraced in exhibit nine.

Other reasons assigned and relied on by appellant are (1) that the court erred in refusing to permit his counsel to answer a point made by the prosecuting attorney in closing the argument for the State, which was that a Mrs. Vance, a witness for defendant, was not worthy of credit, because she was of unsound mind, (2) insufficiency of the evidence to sustain the verdict, and (3) that the verdict is contrary to law.

The first alleged error discussed by appellant's counsel is based on the ruling of the trial court in permitting the State to introduce the evidence of William Fenton, as given at the second trial of this cause, at which trial, as it is shown, said Fenton was fully cross-examined by appellant. The objections urged by appellant in the trial court to the introduction of this testimony were predicated on the right guaranteed by section thirteen of the bill of rights as contained in the Constitution of this State (Article 1, §13), which declares that "in all criminal prosecutions the accused shall have the right * * * to meet the witnesses face to face." The argument presented by counsel is that the evidence of this witness was not competent, in the absence of any showing that the witness was dead or insane. It is especially claimed that sufficient diligence has not been shown by the State in its efforts to secure the attendance of the witness at the trial. It is also urged that the evidence ought not to have been introduced

unless the testimony of said Fenton, as given by him on the first trial, was introduced in connection with that given on the second trial. The record discloses that appellant unsuccessfully moved to strike out the evidence embraced in exhibit nine, being the evidence of the absent witness, unless the State should introduce the evidence of the same witness given on the first trial of the cause.

In respect to the foundation laid by the State, which it claimed entitled it to the admission of the evidence in question, the record discloses that the prosecuting attorney, and other officials, were unable to ascertain the whereabouts of said Fenton. It appears that upon the two previous trials this witness had been brought from Henry county, Indiana, to testify in behalf of the State. In this appeal, the trial below was had at the October term, 1909, of the Fayette Circuit Court, which commenced on October 4, 1909. On the first day of said term this cause was set for trial on October 18. Sometime before the trial the prosecuting attorney inquired of several persons where said Fenton could be found, and was informed that he was at New Castle, Henry county, Indiana. The prosecutor subsequently talked with other persons in regard to Fenton, and they informed him that they did not know where he was, unless he was at New Castle, Henry county. On the first day of the term the prosecuting attorney directed the clerk of the Fayette Circuit Court to issue a subpoena to the sheriff of Henry county to subpoena Fenton to be present at the trial.

The prosecuting attorney testified that as soon as this cause was set for trial at Connersville, Indiana, he directed the clerk to issue subpoenas for all of the State's witnesses. A subpoena for said Fenton was sent to the sheriff of Henry county, and he was requested to send Fenton, if found in that county, to Connersville, in order that he might be present at the trial. Search appears to have been made for this witness also in Wayne county, Indiana, and subpoenas issued for him to Henry county and other counties were

returned by the respective sheriffs indorsed "Not found." The following evidence, in addition to that set out, was given by the State.

Witness Buckley testified as follows: "I am sixty-eight years old, and reside at Connersville, Indiana, where I have resided forty-two years. I am acquainted with William Fenton. He is fifty-five or sixty years old. I have known him twenty years. He is a stonemason, and has resided in Connersville fifteen to eighteen years, though he is occasionally away on business in other towns. It has been some weeks since I saw him, and I have no knowledge of his whereabouts. He has done work for me. I have not made any search or inquiry for him. I heard he went to work at New Castle, Henry county, Indiana."

William Fenton, Jr., testified as follows: "I live in Connersville, and have resided there for twenty-six years. I am the son of William Fenton. I do not know where he makes his home, nor where he is. Prior to the close of the former Wilson trial he made his home at Connersville for about twenty-six years. I have not seen him since that trial, and do not know where he went, but have heard he went to New Castle. I told the sheriff that I did not know where my father is. I am his only son. We did not live together. I have not been interested in him, as we are not on very good terms."

Anson B. Miller testified as follows: "I am sheriff of Fayette county. Wilson and Fenton conversed with each other frequently while in the jail. I have made efforts to find William Fenton since the beginning of this trial. We sent a subpœna, issued by the clerk, to New Castle, Indiana, where Fenton was on the former trial, and he could not be found. I was in communication with the sheriff up there on Tuesday or Wednesday of this week, and instructed him, if he could find Fenton to send him to Connersville. The sheriff had the subpœna, and promised to notify me by telephone if he found Fenton. He telephoned me that he

had not seen anything of Fenton around there for three weeks, and that Fenton had left there. The sheriff said Fenton might be in Cambridge City or Richmond, and I went to both places night before last, and took with me the sheriff and deputy of Wayne county. We searched Richmond all over as near as we could. People who knew Fenton had not seen him. Fenton frequents saloons, and we inquired at different saloons and boarding houses, but were not able to find him. I inquired for Fenton of the police at Cambridge City on my way to Richmond, and went back there from Richmond and looked for him myself, and made inquiry, but could find no trace of him. The reason the New Castle sheriff thought Fenton might be at Cambridge City or Richmond, was that there was some railroad work going on around there. At Cambridge City I went to the contractor who had a list of names of his men. Fenton was not on the pay-roll, and the contractor knew nothing of him. My riding bailiff, Roe Sanders, went into different counties out from Connersville. I have made inquiry of several of Fenton's acquaintances since my return—of Duff Murphy and Will Michaels, and others whose names I do not know—and have been unable to get any trace of Fenton. I have not seen him since the former trial of this case. I did not inquire at Rushville. I did inquire in Brookville. I went there last week. I had a subpoena with me when I made these visits. The first subpoena for this trial came into my hands day before yesterday. The court asked me to find Fenton, if I could."

Anna Henry testified as follows: "I am the official stenographer for this court, and was such, and was sworn as court reporter to take the evidence, on both former trials of this case, and did so. I correctly took and transcribed into longhand the evidence of William Fenton on the second trial."

Upon the showing made by the State at this preliminary hearing, the trial court held that the testimony of William

Fenton, the absent witness, given by him upon the former trial of this cause, at which time he was cross-examined by defendant, was competent, and permitted the State, over defendant's objection, to introduce it in evidence to the jury. The testimony in question was quite material for the State.

Counsel for appellant contend that under the provisions of article 1, §13, of our Constitution, appellant had a right to demand that he be permitted to meet the witnesses of the State face to face. Certainly that is true, but it is well settled that in a criminal prosecution, under certain circumstances, the reproduction of the testimony of a witness upon a former hearing or trial of the same case, where the accused party either cross-examined such witness or was afforded an opportunity to do so, does not contravene the constitutional provision securing to the accused the right of confrontation. *Sage* v. *State* (1891), 127 Ind. 15; *Bass* v. *State* (1894), 136 Ind. 165; *Wabash R. Co.* v. *Miller* (1902), 158 Ind. 174; *State* v. *Heffernan* (1908), 22 S. Dak. 513, 118 N. W. 1027, 25 L. R. A. (N. S.) 868; *Jacobi* v. *State* (1901), 133 Ala. 1, 32 South. 158; *State* v. *Nelson* (1904), 68 Kan. 566, 75 Pac. 505; *Hobbs* v. *State* (1908), 53 Tex. Crim. 71, 112 S. W. 308; 3 Rice, Evidence §224, and authorities cited.

Counsel for appellant insist that the preliminary evidence does not disclose that the State exercised sufficient diligence in order to discover the whereabouts of the witness 2. Fenton. The question presented for our determination is, Did the State, by the preliminary evidence which we have herein set out, lay a sufficient foundation to authorize the introduction of the evidence of Fenton, the absent witness? The admission of such testimony is an exception to the general rule of the law which excludes what is denominated "hearsay evidence." The origin of this exception arises out of necessity in the administration of justice, and the fact that the defendant or the accused in a criminal prosecution has, at a former trial or hearing in the same

case, been afforded the opportunity to confront and cross-examine the witness or witnesses whose evidence is offered to be reproduced, is held to meet or satisfy the provision of the Constitution which guarantees to him the right to meet the witnesses "face to face." Admission of such evidence in a criminal prosecution is not confined to a case where the the witness whose former evidence is offered has died or become insane since the trial at which it was given, but the rule extends and is applicable to the former testimony of a witness who is permanently or indefinitely absent from the State, and, therefore, beyond the jurisdiction of the court in which the case is pending. *State* v. *Nelson, supra; Hobbs* v. *State, supra; Jacobi* v. *State, supra;* 5 Ency. Ev. 904; 3 Rice, Evidence §224, and authorities there cited.

The reproduction and admission of the evidence of Fenton was, under the circumstances and facts in this case, within the sound legal discretion of the trial court, but the 3. exercise of such discretion might be abused by the court, and the question of its abuse is one which may be reviewed and determined by this court on appeal.

The question then presented is, Did the lower court, in view of the foundation laid by the State under the preliminary evidence given, abuse its discretion in permitting 4. the testimony in controversy to be introduced in evidence? It is disclosed that the State, by the prosecuting attorney and the sheriff of the court, exercised reasonable diligence, and made a *bona fide* search and effort to discover the whereabouts of said Fenton, in order to have him present at the trial. The subpœnas issued for him were returned by the sheriffs to whom they were issued, indorsed "Not found." A son of the witness testified that he did not know where his father was, that he had not seen him since the former trial, which was four months prior thereto. The testimony of the sheriff of Fayette county disclosed that he had made various searches and inquiries to discover where Fenton might be found. It appears that he sent his

bailiff into different counties of the State in order to find the witness. The trial court, as the sheriff stated, directed him to find Fenton if possible. The prosecuting attorney testified that he had been unable, after the search and inquiries that he had made, to locate the witness. There was no direct evidence to show that Fenton, the absent witness, was at any place within the State, or if he was, that he was in any of the counties into which the subpœnas had been sent for him, or search made to discover his whereabouts.

This being a criminal prosecution, the deposition of the witness could not be taken by the State and used upon the trial without appellant's consent. Under the 5. circumstances, the State, in the exercise of reasonable diligence which the law exacted of it to find the witness if within the State, was not bound to issue subpœnas for him into each and all of the counties 4. of the State, or to send persons throughout the State in order to discover where the witness might be found.

Under the evidence given at the preliminary hearing, we believe that the lower court was warranted in concluding that by the exercise of reasonable diligence the absent witness could not be found within the State, and was justified in inferring that the witness was not within the jurisdiction of the court. *People* v. *Gannon* (1882), 61 Cal. 476; *People* v. *Riley* (1888), 75 Cal. 98, 16 Pac. 544. Under the circumstances, we cannot say that the court abused its discretion in admitting the evidence in question. We are further of the opinion that by the admission thereof none of appellant's substantial rights were impaired.

There is no merit in the argument that the court erred in admitting the evidence of the witness Fenton given at the second trial without requiring the introduction by the 6. State, in connection therewith, of his evidence at the first trial. It is in no manner disclosed that the admissibility of his testimony given upon the second trial in any manner depended upon that which he gave at the first

trial.  If the evidence of this witness on the first trial tended to contradict that given by him on the second trial, then appellant might have offered to introduce it for that purpose. This he did not offer to do.

On the trial, Mrs. Adeline Vance, a witness who testified on behalf of defendant, stated that about 10:30 o'clock a. m. on March 3, 1909, that being the day of the 7.  homicide, as she was riding in a phaeton by the home of the defendant, she looked up and saw his wife looking at her from the south window of the house.  On cross-examination she stated that what attracted her attention was the thought that Mrs. Wilson was looking at her while she (the witness) was whipping her horse, and that caused her to look up and see Mrs. Wilson looking at her through the window.  She was also cross-examined in regard to some contradictory statement which it was claimed she had made while testifying at the coroner's inquest.  The bill of exceptions recites that one of the attorneys for the State in the closing argument, in commenting upon the evidence of this witness, and in attempting to break the force of it, said that "said witness was probably insane; that the fact that said witness claimed or believed that her attention had been called to decedent, Maud Wilson, at the time the witness claimed to have looked up, and to have seen the decedent looking at her through a window was caused by the fact that the decedent so looking at the witness had caused the witness to look up and see her, indicated that the witness was insane."

To this argument appellant, by his counsel, at the time objected, and at the close of the argument by the prosecuting attorney he moved for leave to reply to the argument of the attorney in which he had attacked the sanity of Mrs. Vance. Defendant stated to the court at the time that the sanity of his said witness had not been questioned by any evidence introduced in the case, and that it had in noway been referred to in the argument by the attorneys representing the

State, who had previously argued said cause; and that the suggestion that the witness probably was insane was a new point not previously raised in the case. The court, however, overruled the motion of defendant to be permitted to reply to the argument of the prosecuting attorney, and refused to permit him by his counsel to reply to it, to which ruling of the court defendant objected and excepted. Thereupon the court, on its own motion, instructed the jurors that they should wholly disregard any argument or suggestion made by counsel, that questioned the sanity of Mrs. Vance.

The insistence of appellant's counsel is that under the provisions of subdivision four of §2136 Burns 1908, Acts 1905 p. 584, §260, appellant had the right to reply to what they term was a "new point" advanced by the counsel for the State in the closing argument. By said subdivision four, it is provided that "the prosecuting attorney shall have the opening and closing of the argument; but he shall disclose, in the opening, all the points relied on in the case, and if, in the closing, he refer to any new point or fact not disclosed in the opening, the defendant or his counsel shall have the right to reply thereto."

The Attorney-General, however, contends that the question in regard to the argument of the State's counsel, and the ruling of the court in denying the request of appellant to reply thereto, is not properly presented by the record, for the reason that it is exhibited only by the original bill of exceptions containing the evidence, which has been certified up without transcribing. An examination of the original bill verifies the Attorney-General's contention, and we might properly dismiss the question attempted to be presented without consideration. *Williams* v. *State* (1908), 170 Ind. 644; *Curless* v. *State* (1909), 172 Ind. 257. However, as this is a case involving the liberty or life of appellant, we have concluded to consider the point sought to be raised, regardless of the infirmity of the record. It is certainly evident, we think, that the State in

a criminal prosecution, under the provisions of §2136, *supra*, is not required in its opening argument to disclose all the criticisms that it may urge in its closing argument against the credibility of the defendant's witnesses. What the statute in question contemplates by providing that the State in the opening argument shall disclose all the points upon which it relies, refers to points or facts relating to the merits of the case; or, in other words, such points or facts as the State may insist go to establish the guilt of the accused. It cannot in reason be held to refer to criticisms made by counsel for the State in respect to the unreasonableness of any of the testimony given by the defendant's witnesses. *Taffe* v. *State* (1892), 90 Ga. 459, 16 S. E. 204.

It was proper for counsel for the State to point out in the closing argument any unreasonableness with which he considered the evidence of Mrs. Vance to be impressed. If his argument in respect thereto was unsupported by the facts in the case, it would be unreasonable to assume that the jury was influenced by his opinion or logic.

9. If he was wrong in the inference that he deduced from the evidence of the witness, such an error is not one that a court can correct. *Behler* v. *State* (1887), 112 Ind. 140; *Warner* v. *State* (1888), 114 Ind. 137; *Shular* v. *State* (1886), 105 Ind. 289, 55 Am. Rep. 211; *Osburn* v. *State* (1905), 164 Ind. 262.

Upon another view, it appears that the court, in regard to the suggestion of counsel as to the sanity of Mrs. Vance, in positive language admonished the jury wholly to disregard such argument. It would seem that this admonition from the trial court had fully as much influence on the jury as any reply which counsel for appellant could have made in respect to the argument.

7. The next and final proposition argued by appellant's counsel is that the evidence is not sufficient to sustain the

verdict.   Under a well-settled rule, in reviewing and
10.  considering evidence in a case on appeal to this court,
only such as is favorable to the verdict of the jury
will be considered and regarded.   *Williams* v. *State, supra;*
*McReynolds* v. *Smith* (1909), 172 Ind. 336;  *Schondel* v. *State*
(1910), 174 Ind. 734.

The evidence upon which appellant was convicted, in the
main, was circumstantial.   We shall refer to it in part.   Lulu
Maud Wilson, the subject of the murder, was the
11.  wife of the defendant.   They were married in the
year 1900, and had lived together as husband and wife
until March 3, 1909, the day of the homicide.   It appears
that from girlhood she had been afflicted with epilepsy, and
from time to time she would have "fits," which varied in
degree, sometimes being of a mild character, and other times
they would render her unconscious and wholly helpless.
The house of defendant, in which it is shown that his wife
was murdered, is situated on the Waterloo road immediately
outside the limits of the city of Connersville, Fayette
county, Indiana.   The dead body of Mrs. Wilson was found
about noon on March 3, 1909, lying on a bed in the north
bedroom of the house.   Her skull was crushed, and her face
and head were beaten and crushed.   When found she was
fully dressed in her everyday garments.   The occupation of
defendant was that of a cement worker.   He was also em-
ployed at times as a railroad section hand, and at other times
in digging for contractors and plumbers.   He testified in
his own behalf upon the trial, and stated that on March 3,
1909, he was absent from home, working in a plumber's shop
in Connersville; that he left his home on that morning about
6:35 o'clock, and did not return until about 12:20 o'clock
at noon; that when he arrived at his home he found the
door standing open; that when he entered his house some-
thing attracted his attention, and he opened the door and
looked into the bedroom and saw blood on both sides

of the pillow on the bed, which was standing close to the door; that he entered the room far enough to see that his wife was lying on the bed, with a bed cover thrown diagonally across her; that upon discovering this he, without making any further examination, called to a Mrs. Remmert, a neighbor who lived nearby, and said to her that someone had killed his wife; that he then went over to the home of his mother-in-law, Mrs. Reed, who lived not far away, and told her and Joe Hauck, his brother-in-law, that some one had murdered his wife, or that "it looked that way to him;" that Mrs. Reed and Joe Hauck went with him to his house; that after returning to the house he made an examination of his wife, and discovered that her forehead and the upper part of her face were badly beaten and crushed.

The State introduced the record of the defendant's testimony given before the coroner, whereby it was shown that he testified at the inquest that his wife had a light "fit" on the day previous to the murder, about 5:30 o'clock p. m.; that soon after he, in company with Mrs. Reed and Joe Hauck, returned to his home—the news of the murder having been circulated—the neighbors came to the house, and assisted in preparing and dressing the body of decedent. The evidence given by defendant upon the trial and that given by him before the coroner at the inquest are somewhat contradictory.

Mrs. Reed testified that a short time after noon on March 3 the defendant came to her kitchen door and said to her: "Come over. Somebody has murdered Maud." Joe Hauck testified that defendant said to him at the time: "Come over; Maud is dead. Somebody has murdered her." When they reached the defendant's house, Hauck and defendant went into the bedroom. The deceased wife was covered over. Defendant raised up the cover and said: "There she lays; she is dead. Somebody has murdered her." Defendant testified that a pair of his rubber boots and his

overcoat were missing, and that he had not been able to find them since the murder of his wife.

It appears that defendant was accused of the murder, and was arrested and placed in jail on March 9, 1909. At that time William Fenton, who testified on the second trial, and whose former evidence was reproduced, was also a prisoner in the jail. He testified that he was acquainted with defendant; that shortly after the imprisonment of defendant Fenton desired to show him a newspaper containing some statements made by Joe Hauck; that defendant replied that he did not want to see the paper; that he knew what was in it; that he was always afraid that Hauck would get "rattled" and not know what he said. On another occasion defendant, while in jail, told Fenton that he expected to go to the State's prison; that if he went, "somebody would have to pay for it when he returned."

Fenton further testified that on the same day on which defendant was imprisoned in jail he saw him tear some bloody patches from a shirt that he was wearing, and throw them into a sink in the jail. He also stated that he saw him wash a bloody pocket handkerchief and hang it out to dry. These patches were found in the jail sink and it was shown at the trial that the blood which stained them was the blood of a human being. In a few days after Fenton saw the defendant tearing out these bloody patches from his shirt, he informed the sheriff what he had seen the defendant do.

Mr. Bishop testified that he drove a bread wagon on the day of the murder, and had been so engaged for six months prior thereto; that Mrs. Wilson was one of his customers; that he stopped at defendant's home on March 3 about 10:20 o'clock a. m.; that he rang the door bell, but no one came to the door or answered the call; that previously Mrs. Wilson had always come to the door when he rang the bell, and indicated by a nod of her head if she desired any bread; that on the day of the murder when he stopped at the Wilson

house it was snowing a little, and the wind was blowing from the northwest. The door was standing partly open, the screen door was closed, but the snow was blowing in. He heard no noise and saw no person about the house.

Mr. Thomas testified that he came to defendant's home a short time after noon on March 3, soon after the arrival of Mrs. Reed; that he telephoned to the coroner the information of the murder, but that he returned within a half-hour; that he went onto the back porch and opened the heating stove which was sitting there, and found in it an iron rod which he took out of the stove and handed to Doctor Mountain; that the rod had blood all over it, and when the rod was taken from the stove the blood was not yet dry.

Physicians who examined the body of the decedent, testified that they discovered nothing to indicate that a rape had been committed on the decedent; neither did it appear that the house had been robbed. The gold watch of decedent was on the dresser in the room in which she was lying. Witnesses testified that it appeared that the bed clothing had been thrown over the decedent after she had been placed upon the bed; that from the position of the bed clothes and the way decedent was lying upon the bed when found it also appeared that she had been thrown or placed on the bed by some one. There was blood on the pillow and on the bed clothes, and blood was on the dresser, which was standing in the northeast corner of the room, and also on the window. The blood spots appeared to have come from the direction of the bed. To the left of the door, inside the bedroom, and about two feet from the bed, a pool of blood about eighteen inches long and ten inches wide was on the floor. It looked like about a pint of blood had been spilled there. The physicians testified that, from the examination which they made, they thought the decedent, when found, had been dead from three to six hours, but that she might have been dead longer than that.

Joseph Hauck also testified that on Sunday following the

murder he and the defendant were walking together, and that defendant said to him that the iron rod which had been found in the stove covered with blood looked like one that he (Hauck) formerly had, and further said: "For God's sake do not say anything about it." This witness further testified that on Sunday before the murder he was at defendant's home, and defendant said to him that if anything happened to his wife he would receive $194 from one insurance company and $45 from another company.

After the coroner's inquest the defendant stated to a certain person, who was a witness at the trial, that he wished the coroner would make his report so that he could "straighten things up."

Mrs. Mary Reed testified that she had objected to the marriage of her daughter to defendant, on account of her physical condition, and on account of the family into which she was marrying; that defendant and his wife had lived in a part of her house for three years and a half after they were married; that her daughter had epileptic fits; that defendant and his wife frequently quarreled, and that he never allowed his wife any liberty, and gave her very little money; that she was at the home of defendant on the evening prior to the murder; that her daughter seemed very much worried and depressed, and defendant was angry, and it appeared to her as though he and his wife had been quarreling; that the defendant at that time said to her that he was going to sell off everything he had, and place his wife in a hospital.

Defendant in his testimony attempted to attribute the cause for the spots or stains on his shirt to being bitten by bedbugs.

Certain letters, which were proved to be in the handwriting of defendant, and which appeared to have been written by him while in jail, were introduced in evidence. One of these letters, dated August 31, 1909, addressed to and received by John Krasser, attempted to cast suspicion

upon Hauck as the perpetrator of the murder of 'defendant's wife. This letter warned Krasser to watch his girls; that there was a man out that way who could cause the girls trouble; that he was of that character, and, in the opinion of the writer, was the person who killed Mrs. Wilson, because she "would not give up to him," and that his name, as the writer thought, was Hauck. Another one of these letters purported to be addressed to J. Wilson, and was signed "Black Hand." This letter stated that the writer knew Wilson was innocent, but that Wilson and his father knew something on the writer, and could "stick him," and that if Wilson "got stuck," that "would clear the writer;" that Wilson had better not tell anything on the writer, or there would be another Wilson less in the country; that the writer would not send the letter through the mail, but would put it in through the window. Others of these notes attempted to cast suspicion of the crime upon Hauck.

Mrs. Miller, the wife of the sheriff, testified that two of these letters were found by her in the jail yard, under the windows of the second story of the jail, in which story defendant was confined. She testified that there was about a two-inch space around each of the windows; that defendant had a broom and could reach an arm's length through the bars of the cell, and thereby could push these letters out through the window.

The evidence of Hauck further disclosed that before and after the murder of Mrs. Wilson he and defendant frequently associated together; that on the Sunday after the murder Hauck said to defendant that they were both under suspicion and had "better not be seen together so much;" that defendant said to him that they ought not to quit running together all at once, and that they both would be arrested for the crime. Hauck said to him in reply that he was innocent, but defendant did not say whether he was innocent or guilty; that after he (Hauck) and defendant had been twice examined by the prosecuting attorney the defendant said to him that

their testimony did not correspond, and that they had better not talk about the matter any more. He further said that defendant was nervous and could not sleep. There is evidence going to show that when persons were talking about the murder appellant became nervous and excited; that he was afraid somebody was going to harm him, and carried a revolver when he went out.

There are other circumstances that point to appellant as the guilty person, and these were left unexplained by him, but we do not deem it essential further to extend this opinion by setting out any more of the evidence.

It is not the province of this court to weigh the evidence in a case on appeal, and attempt to reconcile any of the conflicts therein. This rule is applicable whether the

12. evidence is direct or circumstantial, or both. *Sanderson* v. *State* (1907), 169 Ind. 301.

The circumstantial evidence as it appears in the record does not impress us as of such a character that two conflicting inferences might be drawn therefrom—one

13. tending to prove the guilt of the accused and the other in favor of his innocence. Were it of such character, however, it would not be within the province of this court to determine which inference should have controlled the jury. *Sanderson* v. *State, supra.*

The record presents no reversible error, and the judgment below should be affirmed.

Judgment affirmed.