## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Mar 10 2017, 9:39 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Kimberly A. Jackson
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

J. T. Whitehead
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Jeremy A. Perry,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff.* | March 10, 2017<br><br>Court of Appeals Case No.<br>01A05-1603-CR-678<br><br>Appeal from the Adams Circuit<br>Court<br><br>The Honorable Chad E.<br>Kukelham, Judge<br><br>Trial Court Cause No.<br>01C01-1505-F3-3 |

**Riley, Judge.**

# STATEMENT OF THE CASE

Appellant-Defendant, Jeremy A. Perry (Perry), appeals his conviction for aggravated battery, a Level 3 felony, Ind. Code § 35-42-2-1.5; and attempted aggravated battery, a Level 3 felony, I.C. §§ 35-42-2-1.5; -41-5-1.

We affirm.

# ISSUES

Perry raises three issues on appeal which we restate as follows:

(1) Whether the trial court abused its discretion in admitting the deposition testimony of an unavailable witness;

(2) Whether the State presented sufficient evidence to sustain Perry's conviction for aggravated battery and attempted aggravated battery beyond a reasonable doubt; and

(3) Whether Perry's sentence is appropriate in light of the nature of the offenses and his character.

# FACTS AND PROCEDURAL HISTORY

On Memorial Day 2015, Tasha Wilson (Wilson) and Pamela King (King), next-door neighbors in the Belmont Estates in Decatur, Indiana, decided to host a barbecue at Wilson's house. Other guests included Ciarra Hardin (Hardin), Hardin's boyfriend, Rakim, and Hardin's cousin, Perry, who was present intermittently throughout the party.

[5] That same night, Cyle Alverson (Alverson) was working late at the Riverview Tavern, where Marcus Richards (Richards) was also employed. When Alverson's shift ended at midnight, he was met by Richards, who did not have to work that night. They purchased an 18-pack of beer and went to Alverson's home, where they "regularly [] would hang out." (Transcript p. 246). They stood around in Alverson's back yard, listening to music and drinking. At a certain point, they noticed Perry walking in the neighborhood. Alverson, in a "mouthy and cocky" way, told him "quiet down, you're walking to[o] loud." (Tr. p. 248). Perry "got upset" and came towards Alverson and Richards. (Tr. p. 248). He started yelling and said, "I'm going to go get something to 'F' you two up with." (Tr. p. 249). Perry returned to Wilson's house.

[6] When he arrived at Wilson's residence, Perry informed the guests present there that "he had got into an altercation with some guys." (Tr. p. 334). He told Rakim "these bitch ass niggers is trying to start some stuff." (Tr. p. 334). Perry, who was angry, wanted them to "go out, [], and [] take care of it." (Tr. p. 334). After mentioning something to Rakim about "messing somebody up," Perry went to the kitchen sink and then left Wilson's house, almost "running out," with King, Hardin, and Wilson following him into the back yard. (Tr. p. 409).

[7] Within three to four minutes from the first encounter, Perry returned to Alverson's. When Alverson noticed Perry returning, he started walking towards him and they met in Alverson's neighbor's back yard. Alverson could see a "shiny silver object" in Perry's right hand, which Alverson thought to be a "blade." (Tr. p. 251). He "instantly tried to calm the situation down." (Tr. p.

251). Alverson wanted to resolve the altercation and asked to "go [their] separate ways. Be done with it." (Tr. p. 252). Perry replied, "F that and swung the knife" at Alverson. (Tr. p. 252). Perry lunged at Alverson and missed striking his head by about five inches. While Perry was swinging another four to six times, Alverson kept backing up, eventually tripping over his feet and falling backwards. Alverson tried to "crab walk" in an attempt to get away from Perry but Richards intervened. (Tr. p. 253). Richards tackled Perry and Perry made "two swift motions," stabbing Richards. (Tr. p. 254).

[8] Hardin, King, and Wilson, who had arrived at the scene, noticed Richards leaning over against the house, holding his stomach. King heard Perry announce that he had stabbed someone. The women asked Richards what was wrong and if he was okay. Alverson informed them that Richards had been stabbed. Everyone left, except Alverson. Alverson helped Richards, who was drifting in and out of consciousness, and started to walk him to his residence. While returning to his house, Alverson could feel Richards' blood on his arm. He placed Richards in the grass near his front door and noticed a stab wound in Richards' lower back. Alverson pounded on his front door until his wife opened. He told his wife to grab the car keys and to drive Richards to Adams Memorial Hospital.

[9] When Richards arrived at the emergency room at Adams Memorial Hospital, he was "actively dying." (Tr. p. 519). Richards was "just kind of dropped off in the lobby" and when the doctors tried to move him, the wound on Richards' back started bleeding excessively, indicating a collapsed lung. (Tr. p. 513).

Because Richards required advanced trauma life support, he was taken by helicopter to Parkview Hospital. After a full evaluation, it was determined that Richards' stab wounds included one which had lacerated his liver, cut his diaphragm, and punctured his lung.

[10]    After attacking Alverson and stabbing Richards, Perry went to Samantha Comment's (Comment) house. Comment and Perry were "friends with benefits." (Tr. p. 435). A little later, King and Wilson arrived at Comment's house to retrieve King's house keys from Perry. After King had located her keys, Wilson left again but King remained at Comment's residence because she did not wish to be found and questioned by the police, who had arrived in the neighborhood and were looking for a suspect. When the police knocked on Comment's door and asked for entry, Comment refused to let them enter. Meanwhile, Perry was walking back and forth between the bedroom, where Comment was smoking, and the living room, where King was sitting on the couch. Perry and King started to get intimate and had sexual intercourse on the couch. When the police officers returned and knocked a second time asking to enter the house, Comment consented after getting dressed again. Police officers located Perry inside Comment's closet, dressed in his underwear only.

[11]    While in custody in the Adams County Jail, Perry's cell-mate was Chad Sweet (Sweet), who was incarcerated for violating his probation. Perry talked to Sweet about his situation and told him that he "had stabbed this guy[.]" (Tr. p. 454). He explained to Sweet that he had grab[bed] a knife out of [Wilson's] kitchen" and had "st[u]ck the guy with a knife somewhere in the kidney area."

(Tr. p. 454). Perry expressed surprise that "the knife didn't make it all the way through the person to himself because the knife was so long." (Tr. p. 455). Perry told Sweet that after the altercation he returned to Comment's house and threw the knife "in the bottom of a pile of dirty dishes in the sink that already had [] a large amount number of knives and plates [] in the water." (Tr. p. 456).

On May 27, 2015, the State filed an Information, charging Perry with aggravated battery, a Level 3 felony. On November 23, 2015, the State amended the charging information, adding a second Count of attempted aggravated battery, a Level 3 felony. On February 17, 2016, the trial court conducted a three-day jury trial. During the trial, the trial court admitted the deposition testimony of Hardin, over Perry's objection. At the conclusion of the evidence, the jury found Perry guilty as charged. During the sentencing hearing on March 9, 2016, the trial court sentenced Perry to fourteen-years imprisonment for aggravated battery and to twelve-years imprisonment for attempted aggravated battery, with sentences to be served consecutively.

Perry now appeals. Additional facts will be provided as necessary.

# DISCUSSION AND DECISION

## I. *Unavailable Witness*

Perry contends that the trial court abused its discretion by admitting the deposition testimony of Hardin as she was unavailable to testify at trial. Maintaining that the trial court made an error, Perry claims that Hardin was not unavailable for purposes of Indian Evidence Rule 804(b) and the admission

of her deposition also violated his right to confront the witness pursuant to the Sixth Amendment of the United States Constitution and Article I, Section 13 of the Indiana Constitution. The decision to admit or exclude evidence is within the trial court's sounds discretion and is afforded great deference on appeal. *Norris v. State*, 53 N.E.3d 512, 517 (Ind. Ct. App. 2016). An abuse of discretion occurs where the trial court's decision is clearly against the logic and effect of the facts and circumstances before it or it misinterprets the law. *Id*.

## A. *Hearsay*

[15] Hearsay is an out-of-court statement offered to prove the truth of the matter asserted. Ind. Evid. R. 801(c). Generally, deposition testimony of an absent witness offered in court to prove the truth of the matter asserted constitutes classic hearsay. *Garner v. State*, 777 N.E.2d 721, 724 (Ind. 2002). Possible exceptions to the hearsay rule lie under both Indiana Trial Rule 32 and Indiana Evidence Rule 804, which allow the use of prior recorded testimony in lieu of live testimony in certain circumstances. *Id*. Specifically, Indiana Evidence Rule 804 provides a hearsay exception for the prior testimony of a declarant who is unavailable as a witness. Where a declarant is unavailable as a witness, the hearsay rule does not exclude the declarant's former testimony which was given at a lawful deposition and is now offered against a party who had the opportunity to cross-examine the witness. Ind. Evid. R. 804(b)(1)(A). A declarant is unavailable for purposes of this exception if the declarant is absent from trial and the State "has not been able, by process or other reasonable means to procure[] the declarant's attendance." Evid. R. 804(a)(5). If a

declarant is unavailable, a "deposition taken in compliance with the law in the course of the same or another proceeding, if the party against whom the testimony is now offered . . . had an opportunity and similar motive to develop testimony by direct, cross, or redirect examination" is not excluded by the hearsay rule. Evid. R. 804(b)(1)(B). The decision to invoke the rule allowing admission of prior recorded testimony, such as a deposition, is within the sound discretion of the trial court. *Garner*, 777 N.E.2d at 724.

[16] The record reflects that Hardin was deposed on December 15, 2015 by the State. During this deposition, Perry's counsel was present and cross-examined Hardin. Hardin was subpoenaed on December 3, 2016 to appear for Perry's trial and she signed the subpoena on December 7, 2016. At trial, she was called but was not present. Detective Chris Brite of the Decatur Police Department (Detective Brite), testified that after he initially served the subpoena to Hardin at her residence, he returned to the residence to talk to her. He also returned a third time. When he went back a fourth time, Hardin was not home and he placed his business card in her door. When Detective Brite returned a fifth time, the front door had a "notice to remove her from the home" and utility bills, which were past due, were stuck on it. (Tr. p. 357). Detective Brite spoke with the manager at the Belmont Estates who informed him that Hardin might have possibly gone back to Chicago. Text messages sent to Hardin's cell phone were not returned. Three days prior to the trial, Detective Brite returned to Hardin's residence for the last time. He noticed that Hardin's car was still in the parking lot and several documents were still attached to her front door,

including his business card. Based on Detective Brite's repeated efforts to locate and contact Hardin and bring her to testify, we find that the State made reasonable efforts to procure her attendance at trial.

[17] Perry argues that "[s]imply going to [Hardin's] home did not constitute a reasonable effort to locate her, given that police had information indicating she had moved to a nearby city and saw her vehicle parked at her home." (Appellant's Br. p. 25). Whether the State could have secured Hardin had it put forth considerably more effort is speculative at best. Indiana's Rules of Evidence only require a party to make a reasonable effort to secure a witness' presence at trial, not an extra ordinary out-of-state search. Moreover, Perry's claim that "counsel would have displayed a different demeanor [at the deposition] if he had known Hardin's deposition would be trial testimony" is equally unavailing. (Appellant's Br. p. 26).

> Even if the primary motive of a discovery deposition in a criminal case is to obtain a preview of a witness's testimony, this certainly does not exclude the need to understand how the witness's story and credibility might be attacked. We believe that a prudent defense attorney conducting a discovery deposition in a criminal case would not only attempt to ascertain what the substance of the testimony might be but also explore avenues by which the testimony or the witness's credibility might be attacked.

*Berkman v. State*, 976 N.E.2d 68, 78 (Ind. Ct. App. 2012), *trans. denied*, *cert. denied*, 134 S.Ct. 155 (2013). Perry does not explain how he was prevented from pursuing any lines of questioning or how Hardin would have been

questioned any differently at trial. Under the circumstances of this case, we conclude that the trial court did not abuse its discretion by declaring Hardin to be unavailable.

## B. *Confrontation Rights*

[18] Continuing in a similar vein, Perry contends that the admission into evidence of Hardin's deposition testimony after she was declared to be unavailable violated his right to cross-examination. The Sixth Amendment to the United States Constitution provides, in part, that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him[.]" It is well-settled that the admission of prior testimony is constitutional provided certain requirements are met.

> In *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), the Supreme Court held that the Confrontation Clause of the Sixth Amendment to the Federal Constitution prohibits admission in a criminal trial of testimonial statements by a person who is absent from trial, unless the person is unavailable and the defendant had a prior opportunity to cross-examine the person.

*Fowler v. State*, 829 N.E.2d 459, 464 (Ind. 2005), *cert. denied* 547 U.S. 1193 (2006). The confrontation clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish. *Delaware v. Fensterer*, 474 U.S. 15, 20 106 S. Ct. 292, 294, 88 L.Ed. 2d 15 (1985).

[19] Here, Hardin's pre-trial deposition was an extra-judicial statement that is categorized as a testimonial statement for the *Crawford* analysis. *See Crawford*, 541 U.S. at 51-52. Although Hardin could not be located or found prior to trial by reasonable efforts and therefore became unavailable, Perry had a prior opportunity to cross-examine Hardin—and had availed himself of this opportunity—during the deposition. Accordingly, Perry's Sixth Amendment Right was not violated.

## C. *Article I, Section 13 of the Indiana Constitution*

[20] Article I, Section 13 of the Indiana Constitution provides that "[i]n all criminal prosecutions, the accused shall have the right . . . to meet the witnesses face to face[.]" "To a considerable degree, the federal right of confrontation and the state right to a face-to-face meeting are co-extensive." *Brady v. State*, 575 N.E.2d 981, 987 (Ind. 1991). "But because Indiana's clause contains both the right to cross-examine and the right to meet witnesses face to face in the courtroom during trial, Indiana's right to confrontation is more generous." *Harris v. State*, 964 N.E.2d 920, 924 (Ind. Ct. App. 2012), *trans. denied*. Our supreme court has "long recognized that this basic trial right is an ancient one with roots in the common law and that its design has more than a single part." *Brady*, 575 N.E.2d at 986.

[21] In applying this constitutional provision, the supreme court has concluded that the right "is in the nature of a privilege which concerns the individual defendant and bears only upon the procedure on the trial." *Id*. at 987. However, Article I,

Section 13 has not been interpreted literally to guarantee a criminal defendant all rights of confrontation at every trial for every witness; otherwise, no testimony of any absent witness would ever be admissible at trial. *State v. Owens*, 622 N.E.2d 948, 951 (Ind. 1993). Thus, the right of confrontation "must occasionally give way to considerations of public policy and the necessities of the case." *Id*. As out supreme court explained in *Brady*:

> The right is not absolute. It is secured where the testimony of a witness at a former hearing or trial on the same case is reproduced and admitted, where the defendant either cross-examined such witness or was afforded an opportunity to do so, and the witness cannot be brought to testify at trial again because he had died, become insane, or is permanently or indefinitely absent from the state and is therefore beyond the jurisdiction of the court in which the case is pending.

*Brady*, 575 N.E.2d at 987 (citing *Wilson v. State*, 93 N.E. 609 (Ind. 1910)).

[22] This constitutional framework allows the use of prior deposition testimony provided the trial court finds that the witness is unavailable and the statement bears sufficient indicia of reliability. *Owings*, 622 N.E.2d at 952. In short, a deposition that comports with the principal purposes of cross-examination provides sufficient indicia of reliability. *Id*. The focus of the test is not on whether the trial court believes the witness to be telling the truth, but rather on the process by which the prior statement was obtained. *Id*. As such "[t]estimony given under oath, subject to penalties of perjury[,] and recorded by a court reporter has sufficient indicia of reliability." *Id*. at 953.

Hardin was deposed on December 15, 2015. Her deposition was obtained pursuant to procedures designed to elicit the truth. She was "duly sworn" in before her deposition began. (State's Exh. 38, p. 4). Defense counsel cross-examined her after the State rested its direct examination. The deposition was audio-recorded and transcribed by a court reporter. Accordingly, as Hardin could not be located and was found unavailable for trial, Perry's constitutional rights were not violated when the trial court admitted her properly obtained deposition. Nevertheless, disregarding his counsel's presence at the deposition, Perry now maintains that he "never had an opportunity to confront Hardin face to face or through a meaningful opportunity for cross-examination." (Appellant's Br. p. 31). We have previously held that "criminal defendants generally have no constitutional right to attend depositions." *Owings*, 622 N.E.2d at 951. As Perry cites to no authority for the proposition that he was entitled to attend the deposition as part of a right to assist in his defense, his constitutional right was preserved.

## II. *Sufficiency of the Evidence*

Next, Perry contends that the State failed to present sufficient evidence beyond a reasonable doubt to support his conviction for aggravated battery and attempted aggravated battery. Our standard of review for a sufficiency of the evidence claim is well settled. In reviewing sufficiency of the evidence claims, we will not reweigh the evidence or assess the credibility of the witnesses. *Moore v. State*, 869 N.E.2d 489, 492 (Ind. Ct. App. 2007). We will consider only the evidence most favorable to the judgment, together with all reasonable and

logical inferences to be drawn thereof. *Id*. The conviction will be affirmed if there is substantial evidence of probative value to support the conviction of the trier of fact. *Id.*

### A. *Aggravated Battery*

To convict Perry of aggravated battery, a Level 3 felony, the State was required to establish that Perry knowingly or intentionally inflicted injury on Richards that created a substantial risk of death or caused protracted loss or impairment of the function of a bodily member or organ. *See* I.C. § 35-42-2-1.5. However, Perry does not dispute that he stabbed and battered Richards; instead, his challenge to the sufficiency of the evidence is limited to the argument that the State failed to present sufficient evidence to rebut his claim that he committed the battery in self-defense.

A valid claim of self-defense is legal justification for an otherwise criminal act. *Cole v. State*, 28 N.E.3d 1126, 1137 (Ind. Ct. App. 2015). "A person is justified in using reasonable force against any other person to protect the person or a third person from what the person reasonably believes to be the imminent use of unlawful force." I.C. § 35-41-3-2(c). Nevertheless, a person is not justified in using force if the person has "entered into combat with another person or is the initial aggressor unless the person withdraws from the encounter and communicates to the other person the intent to do so and the other person nevertheless continues or threatens to continue unlawful action." I.C. § 35-41-3-2(g)(3).

[27] To prevail on a claim of self-defense, Perry must show: (1) he was in a place where he had a right to be; (2) he acted without fault; and (3) he had a reasonable fear of death or great bodily harm. *Cole*, 28 N.E.3d at 1137. "When a claim of self-defense is raised and finds support in the evidence, the State has the burden of negating at least one of the necessary elements." *Id.* (citing *Wilson v. State*, 770 N.E.2d 799, 800 (Ind. 2002)). The State may meet this burden "by rebutting the defense directly, by affirmatively showing the defendant did not act in self-defense, or by simply relying upon the sufficiency of its evidence in chief." *Id.* Whether the State has met its burden is a question of fact for the fact-finder. *Id.*

[28] Perry argues that he "did not provoke, instigate, or participate willingly in the violence[;]" rather he suggests that "Alverson initiated the contact by leaving his backyard and confronting Perry." (Appellant's Br. pp. 37, 38). He claims that "[e]ven if Perry threw the first punch, such action was a reasonable response by Perry to protect himself against the threat that Alverson and Richards posed at that moment. Perry only swung at Alverson after a drunk and previously aggressive Alverson confronted him." (Appellant's Br. p. 38). Accordingly, Perry maintains that "[g]iven the verbal altercation earlier, the darkness that surrounded them, and the approach by Alverson and Richards, Perry had a reasonable fear of death or great bodily harm at the time." (Appellant's Br. p. 39). We disagree.

[29] Evidence presented at trial reveals that the State rebutted Perry's claim of self-defense. As the State correctly asserts, Perry "was the attacker, and it was

Richards and Alverson who defended themselves against him." (Appellee's Br. p. 22). The first altercation between Perry and his victims occurred when Alverson, in a "mouthy and cocky" manner, told Perry to "quiet down." (Tr. p. 248). Perry became angry and warned Richards and Alverson that "I'm going to go get something to 'F' you two up with." (Tr. p. 249). At that point, Perry retreated to Wilson's residence and the verbal altercation was ended.

[30] Nevertheless, when Perry arrived at Wilson's home, he was angry and informed the guests that "these bitch ass niggers is trying to start some stuff." He wanted them to "go out, [], and take care of it." (Tr. p. 334). Perry went to the kitchen sink and then left the house, "almost running out[.]" (Tr. p. 409). He returned to Alverson's. When Alverson noticed Perry coming towards them, he could see a "shiny silver object in Perry's hand" and he tried to calm the situation. (Tr. p. 251). Alverson, seeking for a resolution to the escalated situation, advised to "go [their] separate ways. Be done with it." (Tr. p. 252). Perry replied "F that and swung the knife at Alverson[,]" eventually striking Richards several times. (Tr. p. 252).

[31] Instead of backing down after the verbal altercation and remaining at Wilson's residence, Perry escalated the encounter by returning to Alverson's wanting to "take care of it", armed with a knife, and instigating the violence. (Tr. p. 334). Alverson and Richards were unarmed. At no time did Alverson or Richards swing or stab Perry; rather it was Perry who swung first and stabbed, thereby seriously injuring Richards. Moreover, once Perry was at Wilson's residence, he could no longer be in fear of death or bodily harm. While he could have

remained at Wilson's house, he elected to renew the hostilities by returning to Alverson's, where Alverson actively tried to calm the situation. We conclude that the State sufficiently rebutted Perry's claim of self-defense by establishing that Perry instigated the violence and was not in fear of death or bodily harm. *See* I.C. § 35-41-3-2(g)(3).

### B. *Attempted Aggravated Battery*

[32]  To convict Perry of attempted aggravated battery, the State was required to establish beyond a reasonable doubt that Perry engaged in conduct that constituted a substantial step toward knowingly or intentionally inflicting an injury on Alverson that created a substantial risk of death or caused serious permanent disfigurement, protracted loss or impairment of the function of a bodily member or organ. *See* I.C. §§ 35-41-5-1; -42-2-1.5. A person engages in conduct "intentionally," if, when he engages in the conduct, it is his conscious objective to do so. I.C. § 35-41-2-2(a). Perry contends that the State's evidence is insufficient because he never intentionally took a substantial step towards creating a substantial risk of death for Alverson. Again, we disagree.

[33]  Perry intended to inflict injuries on Alverson. He even announced this to Alverson during the verbal altercation by yelling "I'm going to go get something to 'F' you two up with." (Tr. p. 249). Following through on this intent, Perry grabbed a knife at Wilson's home to "take care of it" and returned to confront Alverson and Richards. (Tr. p. 334). Noticing Perry approach, Alverson walked towards him unarmed and in a conciliatory fashion. Instead of calming

down, Perry replied "F that and swung the knife" at Alverson. (Tr. p. 252). The testimony reflects that Perry missed striking Alverson's head by about five inches. While Perry kept swinging, Alverson was backing up, eventually tripping over his feet and falling backwards. Even when Alverson was on the ground, Perry kept coming at him with the knife. However, instead of injuring Alverson, Perry inflicted serious injuries on Richards which nearly caused his death, after Richards intervened and tried to protect Alverson. Accordingly, Perry's statements, along with his actions towards Alverson, demonstrated that he intentionally created a substantial risk of serious injury to Alverson. Therefore, we conclude that the State presented sufficient evidence to support Perry's Level 3 attempted aggravated battery conviction.

### III. *Appropriateness of Perry's Sentence*

[34] Lastly, Perry contends that the trial court erroneously sentenced him to a total of twenty-six years of imprisonment. He argues that this aggregate sentence is inappropriate for two reasons. First, Perry alleges that the trial court's sentencing statement was inadequate, and second, he disputes the appropriateness of his sentence in light of the nature of the crime and his character.

### A. *Sentencing Statement*

[35] Generally, sentencing statements are within the trial court's discretion. *Lewis v. State*, 31 N.E.3d 539, 542 (Ind. Ct. App. 2015). An abuse of discretion has occurred when the sentencing is "clearly against the logic and effect of the facts

and circumstances before the court, or the reasonable, probable, and actual deductions to be drawn therefrom." *Id*. at 541-42. A trial court's sentencing statement is adequate if it is "sufficient for this [c]ourt to conduct meaningful appellate review." *Anglemyer v. State*, 868 N.E.2d 482, 490 (Ind. 2007), *clarified on reh'g*, 875 N.E.2d 218.

> One way in which a trial court may abuse its discretion is failing to enter a sentencing statement at all. Other examples include entering a sentencing statement that explains reasons for imposing a sentence—including a finding of aggravating and mitigating factors if any—but the record does not support the reasons, or the sentencing statement omits reasons that are clearly supported by the record and advanced for consideration, or the reasons given are improper as a matter of law. Under those circumstances remand for resentencing may be the appropriate remedy if we cannot say with confidence that the trial court would have imposed the same sentence had it properly considered reasons that enjoy support in the record.

*Id*. at 490-91. On appeal, we may consider both the trial court's written statement and its comments at the sentencing hearing. *Gibson v. State*, 856 N.E.2d 142, 146 (Ind. Ct. App. 2006).

[36] Perry advances three arguments to declare the trial court's sentencing statement inadequate: (1) the trial court found an improper aggravator, (2) the trial court relied on a more extensive criminal history, and (3) the trial court had an erroneous understanding of self-defense.

[37] First, Perry contends that the trial court's finding that the injury suffered by Richards was greater than the elements necessary to prove the commission of

the offense was not a valid aggravator. In support of this aggravator, the trial court relied on the testimony of the emergency room physician who explained that Richards was "dying on the table," had to be administered O-negative blood—the universal donor—and flown by helicopter to another hospital that was better equipped to deal with his life threatening injuries. (Tr. p. 648). The element necessary to prove aggravated battery is "injury that created a substantial risk of death." *See* I.C. § 35-42-2-1.5. We agree with the trial court that "actively dying" on the table surpasses the element necessary for the offense and can be admitted as a valid aggravator. (Tr. p. 519); *see, e.g., Paul v. State*, 888 N.E.2d 818, 823 (Ind. Ct. App. 2008) ("Death is not a necessary element of the offense of aggravated battery as a Class B felony; it is a valid aggravating factor."), *trans. denied*.

[38] Next, Perry challenges the trial court's treatment of his arrests as convictions, thereby extensively expanding his criminal history that the trial court took into account. We have previously held that "a trial court may consider an arrest record as reflective of the defendant's character and as indicative of the risk that the defendant will commit other crimes in the future." *Cox v. State*, 780 N.E.2d 1150, 1157 (Ind. Ct. App. 2002). Accordingly, the trial court appropriately considered Perry's arrests, in addition to his convictions.

[39] Lastly, Perry claims that the trial court relied on an erroneous interpretation of self-defense while sentencing him. Specifically, the trial court stated as follows:

> [N]ow you assert self-defense, but in that self-defense, you said they didn't get a single shot off on you. The law as far as I know

is for self-defense is equal or lesser force. Retreat when
necessary. You didn't do any of those things. You got more
aggressive and that's a problem especially for a self-defense,
defense.

(Tr. p. 648).[1] Perry now asserts that the statute refers only to the use of "reasonable force." I.C. § 35-41-3-2(c). While we agree with Perry that the statutory language refers to reasonable force, we find that the trial court's statement was harmless. A jury had listened to the evidence, and rejected Perry's theory of self-defense by finding him guilty as charged. Accordingly, during the sentencing hearing, the trial court was merely imposing a sentence based on the jury's convictions.

## B. *Appropriateness of the Sentence*

[40] Perry also contends that his sentence is inappropriate in light of the nature of the offense and his character. Although a trial court may have acted within its lawful discretion in imposing a sentence, Indiana Appellate Rule 7(B) provides that an appellate court "may revise a sentence authorized by statute if, after due consideration of the trial court's decision, the court finds that the sentence is inappropriate in light of the nature of the offense and the character of the

---

[1] The quote advanced by Perry in his appellate brief is a compilation of two different statements. The first part refers to the self-defense statement on page 648 of the transcript, while the sentences "You chose to be aggressive with them and that doesn't even matter as far as which version of the facts I believe. You clearly were to [sic] much of man to even let them touch you[,]" appear on transcript page 652. The partial sentence of page 652 is not related to the trial court's statement on self-defense and therefore we will not consider it in our review.

offender." The defendant has the burden of persuading us that his sentence is inappropriate. *Childress v. State*, 848 N.E.2d 1073, 1080 (Ind. 2006). Whether this court regards a sentence as appropriate at the end of the day turns on its sense of the culpability of the defendant, the severity of the crime, the damage done to others, and a myriad of other facts that some to light in a given case. *Suprenant v. State*, 925 N.E.2d 1280, 1284 (Ind. Ct. App. 2010), *trans. denied*.

[41] Perry was convicted of two Level 3 felonies. The sentencing range for a Level 3 felony is three to sixteen years, with an advisory sentence of nine years. *See* I.C. § 35-50-2-5. The trial court imposed a sentence of twelve years and fourteen years respectively, which are below the maximum sentence authorized by statute.

[42] Turning to Perry's character, we note that Perry was thirty years old at sentencing and had suffered a troubled childhood. He had started to abuse alcohol and drugs at a young age. Perry has a juvenile history which includes allegations of possession of a firearm. In 2004, he was charged in Illinois with possession of a weapon and he pled guilty to unspecified offenses arising out of that same charging information. In 2005, he pled guilty in Illinois to a felony weapon charge and was sentenced to one-year incarceration. He was convicted again in 2006 for possession of a controlled substance and served one-year imprisonment. In 2012, Perry was convicted of an unspecified offense in Illinois for which he served one-year of probation. He violated his probation and was subsequently sentenced to 150 days imprisonment. He was arrested for multiple other offenses in Illinois. He was charged with residential burglary

in Illinois at the same time he was sentenced in the instant cause. Based on this criminal history, it is undeniable that several of Perry's convictions involve violence and a weapon.

[43] With respect to the nature of the offenses, we find the circumstances to be extremely callous. After a brief verbal altercation ended and Perry arrived at Wilson's residence, he chose to return and confront Alverson and Richards for their taunts. Clarifying to the other guests at Wilson's party that he was going to go out "and take care of it" and was going to "mess[] somebody up," he ran into Wilson's kitchen. (Tr. pp. 334, 409). Within three to four minutes of the first encounter, Perry returned to Alverson's. Seeing Perry approach armed with a knife, Alverson tried to calm the situation down. However, instead of going separate ways, Perry elected to attack Alverson. All along, he was not interested in remaining safe at Wilson's residence—even if he had felt threatened during the initial verbal altercation—rather, he elected to return, armed and ready to escalate the situation. Perry did "go get something"—a knife—and he did "mess[] up" at least one of his victims in such a way that he was "actively dying." (Tr. pp. 409, 519). Accordingly, we cannot say that Perry's sentence is inappropriate in light of his character and the nature of the offenses.

## CONCLUSION

[44] Based on the foregoing, we hold that the trial court properly admitted Hardin's deposition testimony because she was unavailable at trial; the State presented

sufficient evidence to sustain Perry's convictions; and Perry's sentence is appropriate in light of the nature of the crime and his character.

[45]    Affirmed.

[46]    Crone, J. and Altice, J. concur